932 F.2d 842
 19 Fed.R.Serv.3d 1507
 Timothy HAMMER, Plaintiff-Appellee,
v.
Charles GROSS; Armando Zatarain; Newport Beach City,
Defendants-Appellants,
and
Linda Delapena, et al., Defendant.
Timothy HAMMER, Plaintiff-Appellant,
v.
Charles GROSS; Armando Zatarain; Newport Beach City, Linda
Delapena et al., Defendants-Appellees.
 Nos. 87-6682, 88-5638.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 22, 1990.
Decided May 13, 1991.
 
 Stephen Yagman and Marion R. Yagman, Yagman & Yagman, P.C., Venice, Cal., for plaintiff-appellant, plaintiff-appellee.
 Thomas J. Feeley, Burke, Williams & Sorenson, Los Angeles, Cal., for defendants-appellees, defendants-appellants.
 Frederick R. Miller, Jr., Supervising Deputy Atty. Gen., State of Cal., San Diego, Cal., as amicus curiae for defendants-appellees, defendants-appellants.
 Jeffrey Wertheimer, Rutan & Tucker, Costa Mesa, Cal., as amicus curiae for defendants-appellees, defendants-appellants.
 Appeal from the United States District Court for the Central District of California.
 OPINION
 Before GOODWIN, BROWNING, SCHROEDER, FARRIS, D.W. NELSON, CANBY, REINHARDT, BEEZER, KOZINSKI, THOMPSON and FERNANDEZ, Circuit Judges.
 
 
 1
 CANBY, Circuit Judge, announcing the judgment of the Court and an opinion of which all but Section III and IV is that of the Court. Section III of Judge Canby's opinion is joined by Judges Schroeder, Farris, and Reinhardt; Section IV is joined by Judges Schroeder, Farris, D.W. Nelson and Kozinski:
 
 
 2
 Appellant Timothy Hammer brought this action under 42 U.S.C. Sec. 1983, alleging that his constitutional rights were violated when a police officer, having arrested Hammer for drunken driving, employed force to cause Hammer to submit to extraction of a blood sample. A jury awarded Hammer damages against Armando Zatarain, the officer who employed the force, Charles Gross, then chief of police, and Newport Beach City, the employer of Zatarain and Gross. On appeal, a panel of this court reversed, holding that the trial judge erred in denying the defendants' motions for directed verdict and judgment notwithstanding the verdict. Hammer v. Gross, 884 F.2d 1200 (9th Cir.1989). Upon Hammer's petition, the full court then ordered this rehearing en banc.
 
 
 3
 * The facts, viewed in the light most favorable to Hammer, were well-stated in the previous panel's opinion; for convenience, we repeat most of them here. In June 1985, Hammer was arrested upon probable cause for driving under the influence of alcohol, after failing a series of field sobriety tests administered by defendant Zatarain. After applying handcuffs, Zatarain told Hammer that he would be required to take one of three chemical tests (blood, breath or urine) to determine his blood alcohol level. Hammer replied that he refused to take any of the tests. He later testified that he did so because he thought "there was a good possibility" that a chemical test would indicate that he was intoxicated.
 
 
 4
 Zatarain transported Hammer to the emergency room of a Newport Beach hospital to obtain a blood sample. Upon arrival, Zatarain handcuffed Hammer by his right wrist to a hard plastic chair. Approximately five minutes later, Zatarain again asked Hammer whether Hammer would submit to a blood test; Hammer again verbally refused. At that point, Zatarain told a hospital laboratory technologist to withdraw the blood sample despite Hammer's objections. Although Zatarain denied ever having touched Hammer from the time he was first seated in the chair until the technologist completed the blood withdrawal, Hammer testified that the officer grabbed his shoulders from behind and held him down in the chair while the technologist began to swab his left forearm with iodine. Hammer, who later testified that he doesn't like needles, "jumped" when the technologist attempted to insert the needle into his arm. At that point he and Zatarain, who continued trying to restrain Hammer as Hammer tried to "wrestle away" from the needle, both went over sideways onto the floor along with the chair to which Hammer was still handcuffed. Hammer twisted his back as he hit the floor.
 
 
 5
 After picking Hammer up off the floor, Zatarain told Hammer that he was going to take the blood sample "the easy way or the hard way." Zatarain then went into the hallway, called in two other police officers to assist him and the technologist in administering the blood test, and threatened that they would throw Hammer to the floor and pin him down to complete the test if necessary. Hammer testified that at that point he said that he would consent to a breath test "if that's what it's going to come to," but that Zatarain insisted upon the blood test and once again held Hammer down in the chair while the technologist took the blood sample as the officers watched.
 
 II
 
 6
 The first question before us on rehearing is whether the above facts can sustain the jury's verdict consistently with applicable law. Additional questions are whether the trial court properly instructed the jury in light of that law and, if not, whether defendants preserved the issue for appeal.
 
 
 7
 The foundation case is Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In Schmerber, the Supreme Court held that it did not violate the Fourth Amendment for police, upon probable cause but without a warrant, to cause a blood sample to be taken from an arrested, hospitalized suspect who had declined to take a breathalyzer test. Although the suspect had refused to consent to the extraction of blood, there was no suggestion of physical resistance by the suspect or use of force by the police. In determining that the extraction of blood was not an unreasonable search, the Court emphasized the routine nature of the test, and the fact that it was performed by a physician in a hospital environment. The Court noted that these factors had earlier led the Court to hold that extraction of blood from an unconscious, hospitalized suspect after a fatal crash did not "shock the conscience" and thereby violate the due process clause of the Fourteenth Amendment. See Breithaupt v. Abram, 352 U.S. 432, 435-38, 77 S.Ct. 408, 410-12, 1 L.Ed.2d 448 (1957). The Court in Schmerber also said, however, that
 
 
 8
 Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the "breathalyzer" test petitioner refused.... We need not decide whether such wishes would have to be respected.
 
 
 9
 Schmerber, 384 U.S. at 771, 86 S.Ct. at 1836. The Court also noted that it reached its judgment "only on the facts of the present record," and that its holding in no way indicates that the Constitution "permits more substantial intrusions, or intrusions under other conditions." Id. at 772, 86 S.Ct. at 1836.
 
 
 10
 As we have said, Schmerber involved no physical resistance and no use of force. The defendants argue, however, that the decision necessarily legitimizes the use of force to overcome resistance to a procedure that the defendants are entitled to employ. The Supreme Court could not have intended a rule, they say, that would refuse to honor a suspect's purely verbal objection but would give effect to an objection backed by physical resistance. Defendants support their argument with a footnote in Schmerber relating to the Court's rejection of Schmerber's Fifth Amendment argument:
 
 
 11
 We "cannot see that it should make any difference whether one states unequivocally that he objects or resorts to physical violence in protest or is in such condition that he is unable to protest." Breithaupt v. Abram, 352 U.S., at 441 [77 S.Ct. at 413] (Warren, C.J., dissenting). It would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force.
 
 
 12
 * * * * * *
 
 
 13
 Schmerber, 384 U.S. at 760 n. 4, 86 S.Ct. at 1830 n. 4.
 
 
 14
 We assume for purposes of decision that Schmerber does not preclude the use of force in some circumstances to extract a blood sample from a resistant suspect. The crucial question in this case, however, is whether a rational jury could conclude that the force used was excessive under the circumstances presented here. The defendants argue in part that the force could not have been excessive because, as plaintiff concedes, it did not rise to a level that "shocks the conscience." But to say that force must "shock the conscience" is to employ a shorthand version of a due process test that is no longer the correct one for evaluating the propriety of force used in effecting a search or seizure. Because the right in issue arises under the Fourth Amendment, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).[1] The test balances the intrusion on the individual's Fourth Amendment right against the governmental interests at stake, id., 109 S.Ct. at 1871, and the reasonableness of the search is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 1872. We have held that the Graham analysis is to be applied retroactively. Reed v. Hoy, 909 F.2d 324, 327-28 (modifying 891 F.2d 1421 (9th Cir.1989)).
 
 III
 
 15
 We address, then, the question whether a rational jury could find that the actions of the defendants in employing the force that they did to overcome Hammer's resistance and extract his blood were not " 'objectively reasonable' in light of the facts and circumstances confronting them." Graham, 109 S.Ct. at 1872. The defendants contend that the force they employed was reasonable as a matter of law because, in addition to its not "shocking the conscience," it was no greater than that required to overcome Hammer's resistance. The test of reasonableness is not that one-dimensional, however. For example, deadly force may not constitutionally be used against a fleeing non-dangerous burglary suspect, even though that is the only way that he can be apprehended. "A police officer many not seize an unarmed, nondangerous suspect by shooting him dead." Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances.
 
 
 16
 The jury, then, was entitled to consider several factors in determining whether the force used against Hammer was unreasonable. One is the fact that Hammer was actively resisting the extraction of his blood. See Graham, 109 S.Ct. at 1872. Others include "the severity of the crime at issue" and whether Hammer posed "an immediate threat to the safety of the officers or others." Id. It is also appropriate to consider whether the police "refused to respect a reasonable request to undergo a different form of testing." Schmerber, 384 U.S. at 760 n. 4, 86 S.Ct. at 1830 n. 4. Finally, in weighing the "countervailing governmental interests at stake," Graham, 109 S.Ct. at 1871, some attention must be given to the degree of the authorities' need for the blood sample.
 
 
 17
 Many of these factors weigh in favor of Hammer. It is true that he was forcibly resisting the test, which he had no right to do. On the other hand, his offense, while certainly not to be taken lightly, was a misdemeanor. (In Schmerber, the offense was potentially a felony, because a person had been injured. Schmerber, 384 U.S. at 768-69 n. 12, 86 S.Ct. at 1834-35 n. 12. In Breithaupt, three persons had been killed. Breithaupt, 352 U.S. at 433, 77 S.Ct. at 409.) Hammer certainly posed no threat to the safety of the officers or others. Moreover, after some force had been applied but before the blood was actually extracted, Hammer had agreed to submit to a breathalyzer test. Consent to a breathalyzer test may very well have reduced to insignificance the defendants' need to extract Hammer's blood. The defendants argue that Hammer's belated consent to take a breathalyzer test was not given in good faith, but was a mere ploy to create further delay. That is possible, but we cannot say that bad faith was established as a matter of law. The jury could have concluded that the consent was genuine, rendering further use of force unreasonable.
 
 
 18
 In light of all these considerations, and of the fact that "the integrity of an individual's person is a cherished value of our society," Schmerber, 384 U.S. at 772, 86 S.Ct. at 1836, we conclude that the question of the reasonableness of force applied by the defendants in the circumstances of this case was properly one for the jury. The district court did not err, therefore, in determining that the defendants were not entitled to a directed verdict or to judgment notwithstanding the verdict.
 
 IV
 
 19
 The defendants argue that the verdict still should not stand because the jury was misled into believing that no force could ever properly be employed to extract a blood sample. Analysis of this issue is complicated somewhat by two factors. The first is that the jury was instructed to apply the due process test of unreasonable force that was rejected in Graham. That test evaluates claims of excessive force in light of four factors,[2] and was set forth in the jury instructions in this case as follows:
 
 
 20
 Now plaintiff may recover for excessive use of force under section 1983 of the civil rights laws if the degree of force used was unreasonable under the circumstances or if the force was used for an improper purpose. The following factors are relevant to determining whether the use of force was reasonable or properly motivated:
 
 
 21
 A court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
 
 
 22
 It was the fourth factor, with its subjective, motivational component, that the Supreme Court found particularly objectionable in Graham, 109 S.Ct. at 1872-73. It arguably could have permitted the jury in this case to find that force had been applied to Hammer with an improper motive, rendering the use of force impermissible.
 
 
 23
 The defendants are in no position to complain about the instruction, however, because they did not object to it. Rule 51 is quite explicit that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. This court has enjoyed a reputation as the strictest enforcer of Rule 51; we have declared that there is no "plain error" exception in civil cases in this circuit. Bertrand v. Southern Pacific Co., 282 F.2d 569, 572 (9th Cir.1960), cert. denied, 365 U.S. 816, 81 S.Ct. 697, 5 L.Ed.2d 694 (1961); Brett v. Hotel Employees and Bartenders Union, Local 879, 828 F.2d 1409, 1414 n. 7 (9th Cir.1987); Herrington v. Sonoma County, 834 F.2d 1488, 1500 n. 12 modified on other grounds, 857 F.2d 567 (9th Cir.1988), cert. denied, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989); see Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 213 (9th Cir.1988); Sanders v. Parker Drilling Co., 911 F.2d 191, 209 n. 8 (9th Cir.1990) (Kozinski, J., dissenting). See also 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2558, at 674 (1971) ("the Ninth Circuit stands alone in reading Civil Rule 51 literally and denying that there is any power to reverse for plain error in an unobjected-to instruction in a civil case"). We have said that the sole permissible deviation from the strictures of Rule 51 is that, where the trial court is aware of the party's concerns with an instruction and further objection would be unavailing, we will not require a formal objection. Brett, 828 F.2d at 1414 n. 7; see Brown v. Avemco Inv. Corp., 603 F.2d 1367, 1373 (9th Cir.1979). The defendants in this case certainly did not make known any concern with the court's due process excessive-force instruction, or with its subjective element.
 
 
 24
 We would end our discussion of the district court's instruction here, except for language in two of our recent decisions that seems to cast doubt on our consistent tradition of strict enforcement of Rule 51. In Reed v. Hoy, we dealt with a situation parallel to the one presented here; the district court had not anticipated Graham and had given an unreasonable-force instruction based on Johnson v. Glick. After deciding that Graham was to be applied retroactively, we held that "it was plain error" for the district court to give the Johnson v. Glick instruction. We referred approvingly to Miller v. Lovett, 879 F.2d 1066, 1070 (2d Cir.1989), in which the Second Circuit had held such an instruction to be plain error and had reversed without regard to whether proper objections had been made as prescribed by Rule 51. We also noted in Reed, however, that the appellant had in fact objected to the instruction given and had offered an appropriate one of his own. Reed, 909 F.2d at 330 n. 4 (modifying 891 F.2d at 1421). Subsequently, we were presented with a like case where no objection had been made. We held that it was "plain error" to give the Johnson v. Glick instruction, and that we would have been compelled to reverse for plain error if we had not been able, as we were, to determine that the force used was reasonable as a matter of law. Eberle v. City of Anaheim, 901 F.2d 814, 820 (9th Cir.1990).
 
 
 25
 Despite their language, we do not accept Reed and Eberle as establishing a plain error exception to Rule 51 in this circuit. In neither case was plain error employed as a ground of reversal, nor was the doctrine essential to the decision. See Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1493 (9th Cir.1986) (contrary dictum does not erode precedent foreclosing plain error review of instruction to which objection not taken). Perhaps for that reason, neither Reed nor Eberle dealt with our consistent line of cases rejecting plain error as an exception to Rule 51. We find no justification for abandoning our tradition today. A plain error exception to Rule 51 lacks the authorization that Criminal Rule 52(b) confers in criminal cases.[3] Our established position has spared us "the burden of having to review afterthought claims of errors in the instructions that counsel attempt to bring forward under the banner of plain error." Wright & Miller, supra, Sec. 2558 at 674-75. We adhere to it.
 
 
 26
 Defendants are foreclosed, therefore, from objecting on appeal to the fact that the jury might have based its decision on subjective factors embodied in the court's instruction on excessive force. Defendants claim, however, that the jury was misled for other reasons as well. Their argument is lent some force by the second complicating factor in the record--the fact that Hammer himself took an insupportable position at trial. He adopted the view that, because California law provided for suspending the license of drivers who refused to take any blood-alcohol test, see Calif.Vehicle Code Sec. 13353, California had in effect chosen not to permit forcible extraction of blood for purposes of pursuing criminal charges. Not only is this view contrary to California precedent, see, e.g., Carleton v. Superior Court, 170 Cal.App.3d 1182, 1187 n. 1, 216 Cal.Rptr. 890, 893 n. 1 (1985), it has little to recommend it as a matter of federal constitutional law. The existence of a state administrative scheme for the suspension or revocation of drivers' licenses does not, ipso facto, render the state less entitled than otherwise to prosecute drunken drivers criminally, or to gather evidence for that purpose.
 
 
 27
 Hammer's misguided notion was not, however, the theory on which the case was submitted to the jury. The jury was not told that the use of force was improper; it was told that "plaintiff may recover for excessive use of force under section 1983 of the Civil Rights Laws if the degree of force used was unreasonable under the circumstances or if the force was used for an improper purpose." The jury was further instructed that, in order to prove his claim, Hammer first had to establish "that the defendants performed acts which operated to deprive the plaintiff of one or more of his federal constitutional rights as defined and explained in these instructions by using excessive force against the plaintiff during the course of his arrest." These instructions could not have left the jury with the impression that any force, no matter how reasonable, was impermissible regardless of the circumstances. It is true that Hammer's counsel, in argument, might have conveyed that impression, but the court on numerous occasions warned the jury that the court's instructions, not arguments of counsel, set forth the law to be applied.
 
 
 28
 It is also true that the court instructed the jury on Calif.Vehicle Code Sec. 13353, which provides for suspension of drivers' licenses for refusal to submit to blood-alcohol testing. That instruction was given in connection with Hammer's claim of deprivation of liberty without due process, not his Fourth Amendment claim. The court stated first that "[if] the defendants acted within the limits of their authority under state law, then the defendants could not have deprived the plaintiff of any right 'without due process of law.' " The court then said that "[t]he particular vehicle code statute or ordinance involved here reads as follows" and read section 13353. We need not decide whether this instruction could have been misleading with regard to the Fourth Amendment question of reasonable force that the defendants have made the subject of this appeal. The defendants made no objection of any kind to the instruction. They cannot now argue that it was error for the court to give it. Fed.R.Civ.P. 51.
 
 
 29
 The defendants further complain that the district court, by refusing to give certain instructions requested by the defendants, failed to give the defendants the benefit of the Schmerber decision in establishing the law to be applied by the jury. The requested instructions, however, were segments taken from the Court's reasoning in Schmerber. The trial court, within its discretion, could have concluded that, out of context, those segments would have distorted the balancing process in which the jury was to engage. For example, one instruction urged by defendants stated: "The taking of a suspect's blood for an alcohol test in a medically approved manner does not constitute brutality or shock the conscience, even if it takes place against the will of the suspect." That instruction, appropriate as reasoning in Schmerber where no force had been used, might in the present case have misled the jury to believe that the use of approved medical procedures was a complete defense to the charge of unreasonable force asserted by Hammer. At least the trial court, in its discretion, could so have concluded.
 
 
 30
 Another of the defendants' proposed instructions would have advised the jury that "It is well established that the government may utilize the results of chemical analysis performed upon a blood sample forcibly removed from a suspect provided that (a) the removal is done in a reasonable, medically approved manner; (b) is incident to defendant's arrest; and (c) is based upon the reasonable belief that a person is intoxicated." Certainly the district court could have rejected this instruction as misleading or confusing, because it is addressed to the question of admissibility of the blood sample in other proceedings, and not primarily to the question of reasonableness of force. The instruction also might appear to equate reasonableness of force with employment of a medical procedure. The other instructions offered by the defendants were subject to the same infirmity. The district court did not err in rejecting all of them.
 
 V
 
 31
 Defendant Gross, who was chief of police at the time, and the City contend that, even if Officer Zatarain may be found to have used excessive force, there was no showing that the chief or the city sanctioned the use of such force as a policy. We disagree. Chief Gross testified that during his tenure he was responsible for formulating police policies of Newport Beach. Defendants do not here contest his capacity to establish policy for the City.[4] Chief Gross further testified that the departmental policy when a suspect refused all three blood-alcohol tests was that blood could be forcibly extracted so long as the force used did not shock the conscience. The option to extract forcibly or not was left to the officer's discretion, as was the question whether to accept a belated offer by a suspect to take a breathalyzer test. Another witness, one Bohunis, testified that some months before Hammer's arrest he had been apprehended by Officer Zatarain and, after being unable to complete a breathalyzer test, had been subjected to a blood extraction over his resistance by the very substantial forcible efforts of seven officers. In light of all the testimony, the jury could reasonably have found that Chief Gross had established for the City a policy that permitted the use of more force than was reasonable in the circumstances, in violation of Hammer's Fourth Amendment rights.
 
 VI
 
 32
 Finally, defendants Zatarain and Gross contend that they were entitled to qualified immunity as a matter of law. These defendants are immune from personal liability if reasonable officers in their position, in light of clearly established law, could have believed that the actions they took were lawful. See Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). We conclude, as a matter of law, that reasonable officers could so have believed at the time of Hammer's arrest. At that time, Breithaupt and Schmerber had been decided, permitting withdrawal of a subject's blood when the subject was, respectively, unconscious or objecting. Both cases had established that the intrusion caused by the withdrawal of blood itself was not unreasonable. Breithaupt had accepted the rule of Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), holding force that "shocked the conscience" to be a violation of due process.[5] That standard was not violated by defendants Zatarain and Gross, as Hammer concedes. At the time of Hammer's arrest, Graham v. Connor had not been decided. As we have indicated, Graham imposes a balancing test that can, in the circumstances of this case, result in force being found excessive even though it did not rise to the level that shocks the conscience. Reasonable officers, however, cannot be required to have anticipated the ruling in Graham. We conclude as a matter of law, therefore, that officers Zatarain and Gross are immune from personal liability in damages for their actions in applying or authorizing the use of force that was unreasonable in all the circumstances but well below the level that shocks the conscience.
 
 
 33
 Hammer suggested at oral argument that an officer who has used unreasonable force cannot, by definition, have acted reasonably. A similar contention was rejected, however, in Anderson. Whether a search is "unreasonable" within the meaning of the Fourth Amendment is an entirely different question from whether an officer reasonably could have believed his actions lawful under the Fourth Amendment. Anderson, 483 U.S. at 643-44, 107 S.Ct. at 3040-41. To accept Hammer's contention would be to eliminate all possibility of immunity for violations of the Fourth Amendment, an unacceptable outcome. See id. at 643, 107 S.Ct. at 3040.
 
 VII
 
 34
 Hammer correctly points out that the City is not entitled to the qualified immunity asserted by Officer Zatarain and Chief Gross. Owen v. City of Independence, 445 U.S. 622, 635-57, 100 S.Ct. 1398, 1407-18, 63 L.Ed.2d 673 (1980). We therefore reinstate the verdict against the City for compensatory damages of $2,500.
 
 
 35
 Hammer suggested at oral argument that the City should also be held liable for the compensatory awards[6] against Officer Zatarain and Chief Gross, amounting to $500 each, because they were sued in their official, as well as their individual, capacities. That fact is not at all clear from the record.[7] What is clear, however, is that the City itself was named as a defendant and the jury was instructed that it could award compensatory damages against the City for injury attributable to a city policy. See Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). So instructed, the jury rendered a separate verdict against the City. At the same time, it entered verdicts against Officer Zatarain and Chief Gross for both compensatory and punitive damages. Under these circumstances, it is apparent that the awards against the individuals were individual, not official. Indeed, by the time of trial, Chief Gross had retired; the action nevertheless continued against him individually, and the successor chief of police was not substituted for him. See Brandon v. Holt, 469 U.S. 464, 470-71, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985) (clear that suit is against individual in official capacity when successor is substituted upon departure of original defendant from office).
 
 
 36
 "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent...." Monell, 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55. Here, Hammer expressly included the City as a named defendant. The verdict against the City stands on its own as compensation for the damages caused Hammer by the City's policy. That is the only cost that the public is required to bear. See Owen, 445 U.S. at 657, 100 S.Ct. at 1418. It is not to be supplemented by the awards against Officer Zatarain and Chief Gross, which, in context, were directed against them as individuals.
 
 VIII
 
 37
 In conclusion, we vacate the decision of the three-judge panel, 884 F.2d 1200. We affirm the judgment of the district court insofar as it upholds the award of compensatory damages against the City of Newport. We reverse, on the ground of qualified immunity, the judgments against Officer Zatarain and Chief Gross for compensatory and punitive damages. The issue of attorneys' fees, raised by Hammer's appeal and not presented to us, is remanded to the three-judge panel for its consideration.
 
 
 38
 AFFIRMED IN PART; REVERSED IN PART; REMANDED TO THREE-JUDGE PANEL.
 
 
 39
 REINHARDT, Circuit Judge, concurring specially:
 
 
 40
 I fully agree with Judge Canby's excellent opinion--with one minor exception. To the extent that Section IV sets forth the proposition that the plain error exception is inapplicable in appeals involving civil jury instructions, I disagree. As Judge Canby's opinion acknowledges, the law in our circuit is unclear on this point. Reed v. Hoy, 909 F.2d 324, 327-28 (modifying, 891 F.2d 1421 (9th Cir.1989), and Eberle v. City of Anaheim, 901 F.2d 814, 820 (9th Cir.1990), suggest that we have retreated from the inflexible rule that we alone previously applied. For reasons that are not worth belaboring here, I do not believe it is necessary for us to reach the plain error question in this case. However, if we were required to do so, I would be inclined to take the approach set forth in Reed and Eberle, relax our earlier harsh rule, and join the other circuits in adopting a more flexible and reasonable approach.
 
 
 41
 KOZINSKI, Circuit Judge, with whom Circuit Judge D.W. NELSON joins, concurring in part:
 
 
 42
 For me, this case turns on a single fact: Hammer agreed to submit to an alternative alcohol test to avoid having blood drawn from his vein, but he was nonetheless subjected to the forcible extraction of his blood. The defense offered no evidence that Hammer's consent came too late because an alternative test was unavailable or would no longer be effective. Indeed, since the blood was drawn in a hospital emergency room, one can assume the rather rudimentary equipment necessary for obtaining a urine sample was close at hand. While the record does not reveal the breathalyzer's whereabouts, the police had offered to administer that test to Hammer earlier; it's reasonable to infer that the equipment was still in their possession or nearby.[1]
 
 
 43
 These situations are inherently difficult for everyone involved. The suspect may be confused, disoriented and, in all likelihood, terrified. If an alternative test is readily available and a suspect requests it, police officers may not arbitrarily refuse to administer it simply because the suspect did not have the presence of mind to make a decision more promptly or because he changed his mind. The standard, as always under the fourth amendment, is reasonableness. Defendants have offered no explanation for officer Zatarain's refusal to comply with Hammer's request. Based on the evidence, the jury could conclude that officer Zatarain's refusal to administer an alternative test was unreasonable.
 
 
 44
 While I reach the same result as four of my colleagues who make up the plurality, I am unable to join part III of Judge Canby's opinion because I cannot subscribe to its multifactor analysis.[2] Of the five factors Judge Canby lists, only two are relevant in this particular case. The government's need for the blood is, of course, critical: It would be senseless, cruel and unreasonable for the government to draw blood without needing it. Yet, that's what the jury could have found happened here: Because Hammer consented to a breath test, the government had no need for the blood but nonetheless obtained it forcibly. I also agree that the suspect's request for an alternative form of testing is relevant, although this is just another way of asking whether the government needed the blood. Saying the same thing twice gives it no more weight.
 
 
 45
 The remaining factors--the seriousness of the offense, whether the suspect resists and whether he poses a threat to the officers--gratuitously complicate the plurality's analysis, casting a shroud of uncertainty over a very important area of the law: how officers must handle recalcitrant drunk driving suspects.
 
 
 46
 I don't see why the seriousness of the offense is a relevant consideration. Would the police have been free to ignore Hammer's request for a breath test if only the offense had been more serious? Certainly not. No matter how serious the offense, the availability of an equally effective, consensual method of obtaining the evidence conclusively renders use of the nonconsensual method unreasonable. If the suspect requests a breath or urine test and it will do the job just as well, it must be used in lieu of a blood test--even where the suspected crime is murder in the first degree. There is, in my view, never an excuse for using a more intrusive test when a less intrusive one will do. Any other rule would invite police to harass suspects of very serious crimes by subjecting them to the most onerous test available.
 
 
 47
 Even if the seriousness of the offense were a legitimate factor, the plurality places far too much weight on the fact that drunk driving is a misdemeanor. The plurality cannot dispute that drunk drivers kill tens of thousands of innocent people--and maim hundreds of thousands more--every year. L.A. Times, Dec. 26, 1988, pt. V, at 14, col. 1 (23,632 killed and 560,000 injured by drunk drivers in 1987). Nor can it deny that the state has a real and substantial interest in punishing and deterring drunk driving. See Michigan Dep't of State Police v. Sitz, --- U.S. ----, 110 S.Ct. 2481, 2485-86, 110 L.Ed.2d 412 (1990). Yet, the opinion implies that because California classifies drunk driving as a misdemeanor, it can claim only a minimal interest in enforcing its drunk driving laws. This just isn't so. California may have chosen to classify drunk driving as a misdemeanor because drunk drivers normally can be rehabilitated, a goal that might be impaired by the harsh penalties and stigma associated with the felony label. Then again, the state might have been concerned that juries would be reluctant to subject defendants who look much like themselves to felony convictions. We can only speculate about the state's reasons. Surely, however, drunk driving is as serious a problem as many crimes that are labeled felonies, e.g., stealing $400 of possessions from a corpse;[3] impersonating a bride or bridegroom;[4] or selling 1/10 of an ounce of marijuana.[5] The importance of the state's interest--to the extent it is relevant at all--must be judged by reference to reality, not labels.
 
 
 48
 The second factor considered by the plurality--whether the suspect resists--is certainly relevant in determining how much force the police may use in those many cases where the police have a legitimate need for the blood. But I don't see how it has any relevance in this case. Because the police had no need for blood, they weren't entitled to use any force to obtain it. Why, then, does it matter that Hammer resisted? Only if the police have a reason to draw blood need we consider the suspect's resistance, and then only in judging whether the amount of force used is reasonable.
 
 
 49
 The remaining factor--whether the individual is a threat to the officers--has no bearing at all here. The plurality strips this factor from Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989), without paying any attention to Graham 's context. There, the Supreme Court dealt with use of force during an investigatory stop. Under those circumstances, a suspect may pose a danger to the officers or the public and that risk should be considered in determining whether the force used was reasonable. But I just can't imagine a case where the police need to administer a blood test in self-defense.
 
 
 50
 The bottom line is that officer Zatarain acted properly in every respect but one: He failed to give Hammer an alternative test when Hammer consented to it and when (it appears from the record) the alternative was readily available. The plurality's analysis calls into question other aspects of the officer's behavior, turning virtually every seizure of blood into a jury case. After all, most blood tests will be for run-of-the-mill DUIs (mere misdemeanors); and none will involve the taking of blood to neutralize a threat to the officers. That's two out of five factors favoring the plaintiff--probably enough to preclude summary judgment--just about every time the police take blood.
 
 
 51
 By raising the specter of litigation as to virtually every blood seizure, the plurality threatens to disrupt state procedures for dealing with recalcitrant drunk driving suspects. Drunk driving is a serious problem; there is no reason to gum up the process for obtaining proof of blood alcohol content because of a solitary mistake by one officer in a single case. The plurality does just that by pulling into the balance various factors that have no bearing at all in this, or any other, drunk driving case. Because the plurality's failure to distinguish relevant factors from irrelevant ones will have serious and adverse consequences for enforcement of our drunk driving laws, I cannot join part III of the opinion. Which, of course, means that the plurality's analysis does not become the law of the circuit.
 
 
 52
 Nor can I agree with my dissenting colleagues. As I see it, the dissent places undue reliance on the "one bite" rule embodied in Cal.Veh.Code Sec. 13353. See dissent at 854-55 ("The California courts have also wisely indicated that section 13353 grants a person a single opportunity to submit to a blood alcohol test. Once a person refuses, the police are not obligated to give the person a second opportunity to comply with the statute."). Rules of this sort have no bearing on our constitutional analysis; state law cannot render reasonable that which is not.[6] If the government is going to use force to pin someone to a chair, stick a needle in his arm and drain blood from his vein, against his will and despite his acquiescence in an effective alternative, it had better have a reason. Because the government offered none, I agree that the jury's verdict for Hammer must be affirmed.
 
 
 53
 FERNANDEZ, Circuit Judge, with whom BROWNING, GOODWIN, BEEZER, and THOMPSON, Circuit Judges, join, Dissenting:
 
 
 54
 I respectfully dissent. I believe that the majority misperceives either the scope of the fourth amendment or the strength of the evidence presented to the jury in this case.
 
 
 55
 I do agree that this case is controlled by Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In Schmerber, the Supreme Court sketched the scope of fourth amendment strictures when police extract blood from an unconsenting person. It is clear that the extraction need not be carried out under authority of a warrant if the extraction is necessary to preserve evanescent evidence.[1] 384 U.S. at 770, 86 S.Ct. at 1835. It is also clear that the police are entitled to use some physical force in order to successfully extract the blood sample. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Therefore, the fourth amendment did not prohibit Officer Zatarain from using some force to extract blood from Hammer.
 
 
 56
 As the majority agrees, the analysis is not altered by the fact that California has adopted a statute which mandates that the state's Department of Motor Vehicles suspend the license of any person who refuses to submit to a blood alcohol test after reasonably being requested to do so by a police officer. Cal.Veh.Code Sec. 13353(a) (West's Supp.1990). The California courts have repeatedly indicated that section 13353 does not alter the analysis of fourth amendment claims. See People v. Ryan, 116 Cal.App.3d 168, 82-83, 171 Cal.Rptr. 854 (1981) (section 13353 did not alter constitutional analysis of fourth amendment claim); People v. Puccinelli, 63 Cal.App.3d 742, 746, 135 Cal.Rptr. 534 (1976) ("It is also clear that the right to obtain and utilize [forced blood extractions] under the authority of Schmerber has not been eliminated by the enactment of section 13353.") The California courts have also wisely indicated that section 13353 grants a person a single opportunity to submit to a blood alcohol test. Once a person refuses, the police are not obligated to give the person a second opportunity to comply with the statute. See Dunlap v. Department of Motor Vehicles, 156 Cal.App.3d 279, 283, 202 Cal.Rptr. 729 (1984) (police not required to give person second opportunity to take blood alcohol test after initial refusal); Morphew v. Department of Motor Vehicles, 137 Cal.App.3d 738, 743-44, 188 Cal.Rptr. 126 (1982) (person lawfully arrested for drunk driving may not avoid impact of section 13353 by frustrating officer's ability to administer blood alcohol test). I say this is a wise approach because, whatever might seem ideal to those who have months to ruminate on the situation, it does not seem reasonable to require officers to deal with a driver's tergiversation about tests. At any rate, California has done nothing to alter the application of the fourth amendment; the outcome of this case is controlled entirely by Schmerber and its progeny.
 
 
 57
 Given that the police were entitled to use some physical force to extract a blood sample from Hammer, the issue remaining is whether the force used was excessive. The majority correctly notes that the issue is generally one for the jury to decide. Reed v. Hoy, 909 F.2d 324, 329-30 (9th Cir.1989), modified on other grounds and reh'g denied, No. 87-4324, slip op. 7655 (9th Cir. July 18, 1990). However, in this case there was no evidence from which a reasonable jury could conclude that Officer Zatarain used excessive force. Zatarain did not initiate the use of physical force nor did he use more than was minimally necessary to safely extract the blood sample. On the contrary, he used almost no force at all. As the panel pointed out, and the majority appears to accept, the officer inflicted no violence whatever upon Hammer's person. Any injury occurred as Hammer tried to jump away from the needle, for those activities caused both him and the officer to fall to the floor.[2]
 
 
 58
 While the majority avoids saying so, the effect of its decision is that blood cannot be extracted from a drunk who refuses to have it done, and that is particularly so if the drunk is willing to become the least bit physical about it. That is unfortunate, because whatever one might think about atrocious amounts of force being used for trivial purposes, those thoughts do not define this case. Rather, this is a case where the force itself was trivial and the need to protect the public from the atrocities wrought by this sort of crime--drunk driving--is compelling. In short, even viewing the evidence in the light most favorable to Hammer, as we must, the only reasonable conclusion is that the defendants were entitled to judgment as a matter of law.[3] See Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d 1356, 1360 (9th Cir.1986), cert. denied, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).
 
 
 59
 Finally, I agree that people under arrest, even drunks, must be treated with humanity and justice. The Constitution demands no less. But police officers are humans and citizens also. They, too, deserve to be treated with justice and with respect for their humanity. When they do their jobs properly, judges and juries should not call them lawbreakers and annullers of our Constitution. I fear that the majority does an injustice to the City and to these officers and makes it considerably more difficult for others to do their jobs when faced with recalcitrant citizens.
 
 
 60
 I would, therefore, uphold the decision of the panel and reverse that of the district court.
 
 
 
 [1]
 We agree with the three-judge panel that Graham 's test applies to this search even though Graham did not decide "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins." Graham, 109 S.Ct. at 1871 n. 10. Graham dealt with force used in connection with a seizure of the person, and it may be questioned whether the Fourth Amendment still controls when the seizure or arrest ripens into detention. There is little question, however, that an actual search like the one before us would continue to be governed by Fourth Amendment principles. The Supreme Court left little doubt in Graham that, if the Fourth Amendment is the source of the right in issue, the propriety of force is to be measured by the objective Fourth Amendment test of reasonableness in the circumstances. See Graham, 109 S.Ct. at 1871
 
 
 [2]
 The test was first formulated in Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and was subsequently adopted by this court. E.g., Rinker v. County of Napa, 831 F.2d 829, 831-32 (9th Cir.1987)
 
 
 [3]
 Fed.R.Crim.P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." There is no corresponding provision in the Federal Rules of Civil Procedure
 
 
 [4]
 The question whether Chief Gross could make policy for the City was submitted to the jury with no objection. Since the trial of this case, the Supreme Court has made it clear that the issue is one of state law to be decided by the court before the case is submitted to the jury. Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion)
 
 
 [5]
 Prior to date of Hammer's arrest, we had similarly held due process to be violated by force characterized as "intentional, unjustified, brutal, and offensive to human dignity." Meredith v. Arizona, 523 F.2d 481, 484 (9th Cir.1975)
 
 
 [6]
 Hammer concedes that the City may not be held liable for the punitive damages awards of $2,000 against Officer Zatarain and $10,000 against Chief Gross. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 258-71, 101 S.Ct. 2748, 2755-62, 69 L.Ed.2d 616 (1981) (punitive damages may not be awarded against municipality under Sec. 1983)
 
 
 [7]
 Neither the complaint nor the pretrial order mentions the capacity in which the individual defendants are sued. At one sidebar conference, Hammer's attorney did state that they were sued in both official and individual capacities, but the point was not further discussed
 
 
 [1]
 My dissenting colleagues note that "evidence of intoxication is ... evanescent" and that "delays substantially affect the accuracy of testing." Dissent at 854 n. 1. I fail to understand the relevance of these observations. The deteriorating nature of the evidence might affect the timing of the test, but it has no bearing on the type of test selected. Nothing in the record suggests that the passage of time renders one type of test less reliable than the others; nor is there any proof that administering the test Hammer eventually agreed to would have caused a material delay
 
 
 [2]
 I do, however, join the rest of the opinion, particularly its reaffirmation of our longstanding rule that there is no plain error exception to Fed.R.Civ.P. 51. Canby opinion at 847-848
 
 
 [3]
 Cal.Pen.Code Sec. 642 (West 1988) makes it a felony to commit grand theft from a dead person; under Cal.Pen.Code Sec. 487 (West Supp.1991), grand theft is the theft of possessions worth more than $400. If those possessions happen to be avocados or crustaceans, $100 worth will do; and if it's one of the listed farm animals, its value is immaterial. See id. It follows that the nonconsensual removal of a goat from a corpse would be a felony in California
 
 
 [4]
 Id. Sec. 528 (marrying or pretending to marry someone by falsely impersonating another is a felony)
 
 
 [5]
 Id. Sec. 11359
 
 
 [6]
 The one bite rule doesn't purport to be a creature of the fourth amendment; it's a rule about administrative sanctions. Under it, a suspect's driver's license can be suspended if he refuses to submit to a blood, breath or urine test, even if he consents to one later on. See Dunlap v. Department of Motor Vehicles, 156 Cal.App.3d 279, 283, 202 Cal.Rptr. 729 (1984); Morphew v. Department of Motor Vehicles, 137 Cal.App.3d 738, 743-44, 188 Cal.Rptr. 126 (1982). But no one disputes that Hammer's initial refusal put him in violation of California's implied consent law and that his driver's license could be suspended despite his belated consent. The question is whether it was reasonable to use force to draw blood despite his willingness to submit to another test. That issue is governed by the Constitution, not the California Vehicle Code. We should not confuse one for the other
 
 
 [1]
 Of course, Schmerber and the other cases in this area are driven by the fact that evidence of intoxication is indeed evanescent. Thus, delays substantially affect the accuracy of testing
 
 
 [2]
 Here is Hammer's testimony about the incident: "Q. What's the next thing that happened after she [the nurse] started swabbing your arm? A. Well, when she started to put the needle in my arm, then I jumped. I was saying, no, you are not going to take my blood. And I jumped with him and the chair, and he was trying to hold me down, and I was trying to get away from the needle before she stuck it in my arm. Q. What happened? A. He was pushing me down. I was trying to get away. We both went over onto the ground. Q. With him on top of you? A. He was behind me, like somewhat wrestling with me."
 
 
 [3]
 Perhaps the typically persuasive argument of Hammer's experienced counsel induced the jury to think that any force whatever was too much. If so, it was led into error. Led or not, err it did