David Scott NELSON; Mauricio Baez Fernandez, on behalf of themselves and on behalf of others similarly situated, Plaintiffs–Appellants,

v.

CITY OF IRVINE, Chief of Police Charles S. Brobeck, Officer Troy Gielesh, Officer Shirley Sumner, Officer Robert Landman, California Forensic Phlebotomy, Inc. Defendants–Appellees.

No. 96–56813.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1998.

Decided May 6, 1998.

Jeffrey Wilens, Irvine, California, Barry T. Simons, Laguna Beach, California, for plaintiffs/appellants.

Jeffrey Wertheimer, Rutan & Tucker, LLP, Costa Mesa, California, for defendants/appellees.

Before: BOOCHEVER and KLEINFELD, Circuit Judges, and TANNER, District Judge.*

* Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation.

BOOCHEVER, Circuit Judge:

David Nelson and Mauricio Fernandez, on behalf of themselves and others similarly situated (hereafter collectively "Nelson"), appeal from the district court's judgment on the pleadings in their 42 U.S.C. § 1983 action against the City of Irvine, its chief of police, and several individual officers (hereafter collectively "City of Irvine"), alleging that following their arrests for driving under the influence of alcohol they were coerced into submitting to blood tests in order to determine their blood alcohol level, and deprived of the statutorily mandated option to take a breath or urine test instead.

## I. Facts and Procedural History

The plaintiffs' motion for class certification was pending when the district court dismissed this suit on the pleadings. The claims of the proposed class representatives are described in the first amended complaint, and for purposes of this appeal we accept those allegations as true. *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1460, 137 L.Ed.2d 564 (1997).

Irvine Police Department officer Troy Gielish arrested David Nelson on suspicion of driving under the influence of alcohol ("DUI"). En route to the police station, Officer Gielish radioed ahead for a blood technician, and asked Nelson if he "had a problem" with taking a blood test. Nelson was not advised that he had a choice of a blood, urine, or breath test and, as he interpreted the officer's question as rhetorical, he felt he had no choice in the matter. Nelson submitted to the blood test without offering any verbal or physical resistance, but had.he been given a choice, he now alleges he would have selected a breath or urine test.

Officer Gielish stopped Mauricio Fernandez on suspicion of DUI and asked him to blow into a Preliminary Alcohol Screening Device to determine whether or not he was intoxicated. Officer Gielish advised Fernandez that the results of the preliminary breath test would not be admissible in court regardless of the outcome. Fernandez asked Officer Gielish to list his options. Officer Gielish told him, "a blood, urine, or breath test." Fernandez replied he would take whatever breath test he had to. Fernandez flunked the preliminary breath test, so Officer Gielish arrested him and took him to the station. The officer told Fernandez that a technician was "going to get a blood sample." Fernandez did not verbally or physically resist the taking of the sample. Fernandez alleges that, had he been allowed to exercise his free choice, he would have selected a breath or urine test.

The claims of other plaintiffs provide variations on the same theme. David Tyler was not informed by arresting Irvine P.D. officers that he had a choice of tests, and was told that if he did not cooperate in the taking of a blood test he would be held in jail over the weekend. Vicki Caruso was not informed by Irvine P.D. officers that she had a choice of blood-alcohol tests, and was told she had to submit to a blood test. Jeffrey Capler initially agreed to take a blood test but then changed his mind and informed the arresting officer that he wanted to take a breath test. Although a breath test machine was available, and the blood sample had not yet been taken, the officer told Capler that he could not change his mind and must submit to a blood test. Kristi Giordano was initially permitted to take a breath test, but the officer stopped her in the middle, told her she was doing it wrong, and required her to take a blood test instead. A blood sample was taken against her will. Jeffrey Chancellor was told that if he submitted to a blood test he would be released in four hours, but if he selected a urine test he would not be released for at least 17 hours. He was not offered a breath test. He submitted to a blood test.

Richard Heil was arrested for DUI, transported to the station, and told he had to provide a blood sample. He claims he was not advised of his choice of tests, but instead was told that if he did not provide a blood sample voluntarily, he would be strapped to a chair so that a sample could be forcibly taken. Heil was told that if he resisted and the officer had to call for assistance, he would be jailed for 48 hours. Heil submitted to a blood test. He claims that had he been offered a choice, he would have selected a breath or urine test.

There is nothing in the first amended complaint to suggest that Irvine P.D. officers obtained warrants before administering the blood tests in any of the cases described.

 This court reviews de novo Rule 12(c) judgments on the pleadings. *McGann*, 102 F.3d at 392. A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law. *Id.*

## II. Constitutional Claims

### A. Fourth & Fourteenth Amendments

 To pass constitutional muster under the Fourth Amendment a search must be reasonable. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Generally, a search must also be supported by probable cause, and must be backed up by a warrant, or the circumstances must fit an exception to the warrant requirement. *Winston v. Lee*, 470 U.S. 753, 759–61, 105 S.Ct. 1611, 1615–17, 84 L.Ed.2d 662 (1985). It is undisputed that the police had probable cause for the searches in question. At issue, then, is whether the blood tests were reasonable, and whether "exigent circumstances" or some other exception to the warrant requirement existed to excuse the police from obtaining warrants. We address each of these two distinct inquiries in turn.

#### 1. *Reasonableness*

In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that blood extraction from an arrestee who had refused a breath test is reasonable. However, the Court expressly reserved the question whether the government could take blood when other tests were available or requested:

> Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the "Breathalyzer" test petitioner refused.... We need not decide whether such wishes would have to be respected.

*Id.* at 771, 86 S.Ct. at 1836. The Court also emphasized that its holding "in no way indicates that [the Constitution] permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772, 86 S.Ct. at 1836. Thus, *Schmerber* did not reach the issue whether it violates the Fourth Amendment's reasonableness command to require an arrestee, who has expressed a preference for, or consented to, an available breath or urine test, to submit to a blood test.

In *Winston v. Lee*, the Supreme Court held that it violated the Fourth Amendment forcibly to remove from the chest of a robbery suspect a bullet having evidentiary value. The Court clarified and applied the *Schmerber* balancing test as "the appropriate framework of analysis," noting that "the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers." 470 U.S. at 760, 105 S.Ct. at 1616–17.

Assuming the threshold requirements of probable cause and a warrant or an exception to that requirement have been met, the next step in the *Schmerber* inquiry is to "consider a number of other factors in determining the 'reasonableness' of the blood test." *Id.* at 761, 86 S.Ct. at 1831. The Court noted that a "crucial factor in analyzing the magnitude of the intrusion in *Schmerber* is the extent to which the procedure may threaten the safety or health of the individual." *Id.* When assigning weight to this factor in the case of a blood test, the Court found it significant that the test did not "endanger[ ] the life or health of the suspect," " 'involves virtually no risk, trauma, or pain,' " and "was performed 'by a physician in a hospital environment according to accepted medical practices.' " *Id.* (quoting *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836). "Another factor is the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Id.* at 761, 105 S.Ct. at 1617.

"The integrity of an individual's person is a cherished value in our society." *Schmerber*, 384 U.S. at 772, 86 S.Ct. at 1836–37. Nevertheless, "Schmerber recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." *Winston*, 470 U.S. at 762, 105 S.Ct. at 1617–18. The factors determining the intrusive-

ness of the blood test in this case are largely indistinguishable from those in *Schmerber,* although medical science now teaches that special precautions should be employed in procedures involving exposure to bodily fluids.[1]

To be "[w]eighed against these individual interests is the community's interest in fairly and accurately determining guilt or innocence." *Id.* A blood test is "a highly effective means of determining the degree to which a person is under the influence of alcohol." *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836. The *Winston* Court found that

> Especially given the difficulty of proving drunkenness by other means, these considerations showed that results of the blood test were of vital importance if the State were to enforce its drunk driving laws. In *Schmerber,* we concluded that this state interest was sufficient to justify the intrusion, and the compelled blood test was thus "reasonable" for Fourth Amendment purposes.

*Winston,* 470 U.S. at 763, 105 S.Ct. at 1618. Thus, in weighing society's interest, the Court considered important the effectiveness of the blood test and the unavailability of other means of obtaining the same evidence.

■ California law provides that the amount of alcohol in a person's blood may be shown by chemical analysis of that person's blood, breath, or urine, Cal. Veh.Code § 23155(a), and criminalizes "driving either with the specified blood-alcohol level or with the specified breath-alcohol level." *People v. Bransford,* 8 Cal.4th 885, 890, 35 Cal.Rptr.2d 613, 884 P.2d 70 (1994). Thus, in California, breath and urine tests are equally effective as a blood test in determining whether a suspect has violated the DUI law. *People v. Fiscalini,* 228 Cal.App.3d 1639, 279 Cal.Rptr. 682, 686 (Ct.App.1991). Further, California

law requires that breath and urine tests be available: a DUI arrestee "has the choice of whether the test shall be of his or her blood, breath, or urine, and the officer shall advise the person that he or she has that choice." Cal. Veh.Code § 23157 (West 1997).

When a DUI arrestee consents to undergo a breath or urine test, the government has available to it an effective alternative to a blood test as a means of obtaining the same evidence. We must decide whether, under such circumstances, forcing the arrestee to undergo a blood test is unreasonable.

This appears to be an issue of first impression, although this court considered a closely related issue on similar facts in *Hammer v. Gross,* 932 F.2d 842 (9th Cir.1991) (en banc). *Hammer* involved a blood test taken by physical force by Newport Beach Police from a DUI suspect who had agreed, just before administration of that test, to take a breath test instead.

Timothy Hammer was arrested on suspicion of DUI, and handcuffed after he failed a series of field sobriety tests. At the hospital, Hammer was told he would be required to take one of three chemical tests (blood, breath or urine), but he refused to take any test. The officer handcuffed Hammer to a chair and asked whether Hammer would take a blood test; Hammer again refused. A lab technician made her first attempt to take a blood sample. Hammer jumped and tried to wrestle away, overturning his chair. The officer told Hammer he was going to take blood "the easy way or the hard way." *Id.* at 844. Hammer said he would consent to a breath test "if that's what it's going to come to." *Id.* The officer insisted on a blood sample, which the technician took while the officer held Hammer down in the chair. *Id.*

Hammer brought a § 1983 suit alleging police violated the Fourth Amendment by

---

1. *See, e.g.,* Centers for Disease Control, U.S. Dep't of Health and Human Services, *Guidelines for Prevention of Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Health–Care and Public–Safety Workers,* 17–18 (1989) ("Blood from *all* individuals should be considered infective," and the "[u]se of needles and syringes should be limited to situations in which there is no alternative"); Centers for Disease Control and Prevention, U.S. Dep't of Health & Human Services, *Update: Provisional Public Health Service Recommendations for Che-*

*moprophylaxis After Occupational Exposure to HIV,* 276 JAMA 90 (1996) ("preventing blood exposures is the primary means of preventing occupationally acquired human immunodeficiency virus (HIV) infection"); Ronald L. Nichols, *Percutaneous Injuries During Operation: Who is at Risk For What?,* 267 JAMA 2938 (1992) ("[N]eedle-stick and other sharp injuries ... account for greater than 80% of occupationally acquired cases of HIV infection in [health care workers]").

unreasonably employing excessive force when taking the blood sample. A jury returned a verdict in Hammer's favor and awarded damages. A three-judge panel of the Ninth Circuit reversed, finding the police officer's conduct in restraining the suspect during the blood test was not unreasonable. *Hammer v. Gross*, 884 F.2d 1200 (9th Cir. 1989).

The en banc panel rehearing the case issued a split decision. The central issue in *Hammer* was whether a rational jury could have concluded that the amount of force used by the officers to obtain the blood sample was unreasonable under the circumstances. *Hammer*, 932 F.2d at 845. As *Hammer* makes clear, the inquiry into the reasonableness of use of force to obtain a blood sample requires, inter alia, an evaluation of the "degree of the authorities' need for the blood sample." *Id.* at 846 (plurality opinion).

The plurality opinion describes factors that should be analyzed to determine whether the force used to extract a blood sample was unreasonable, including severity of the crime, whether the suspect actively resisted, and whether he posed an immediate threat to the officers or others. "It is also appropriate to consider whether the police 'refused to respect a reasonable request to undergo a different form of testing.'" *Id.* (quoting *Schmerber*, 384 U.S. at 760 n. 4, 86 S.Ct. at 1830 n. 4 which significantly noted that it "would be a different case" if the police had refused to respect such a request). Applying that factor, the opinion reasoned: "Moreover, after some force had been applied but before the blood was actually extracted, Hammer had agreed to submit to a breathalyzer test. Consent to a breathalyzer test may very well have reduced to insignificance the defendants' need to extract Hammer's blood." *Hammer*, 932 F.2d at 846. Although the defendants claimed Hammer's belated consent was merely a ploy, "[t]he jury could have concluded that the consent was genuine, rendering further use of force unreasonable." *Id.*

In concurring, Judge Kozinski wrote: "For me, this case turns on a single fact: Hammer agreed to submit to an alternative alcohol test to avoid having blood drawn from his vein, but he was nonetheless subjected to the forcible extraction of his blood." *Id.* at 851 (Kozinski, J., concurring). This, according to Judge Kozinski, was unreasonable:

If an alternative test is readily available and a suspect requests it, police officers may not arbitrarily refuse to administer it simply because the suspect did not have the presence of mind to make a decision more promptly or because he changed his mind. The standard, as always under the fourth amendment, is reasonableness. Defendants have offered no explanation for [the officer's] refusal to comply with Hammer's request. Based on the evidence, the jury could conclude that [the officer's] refusal to administer an alternative test was unreasonable.

. . . .

The government's need for the blood is, of course, critical: It would be senseless, cruel and unreasonable for the government to draw blood without needing it. Yet, that's what the jury could have found happened here: Because Hammer consented to a breath test, the government had no need for the blood but nonetheless obtained it forcibly.

*Id.* at 852. Judge Kozinski argued that under the circumstances of the case, none of the other factors listed in the plurality opinion mattered:

No matter how serious the offense, the availability of an equally effective, consensual method of obtaining the evidence conclusively renders use of the nonconsensual method unreasonable. If the suspect requests a breath or urine test and it will do the job just as well, it must be used in lieu of a blood test-even where the suspected crime is murder in the first degree.[2]

*Id.*

Thus, a majority of the en banc panel indicated that if an alternative test is readily

---

2. Judge Kozinski resolved the other two factors as follows: 1) "[W]hether the suspect resists is certainly relevant in determining how much force the police may use" but "because the police had no need for the blood, they weren't entitled to use any force to obtain it." *Id.* 2) "The remaining factor-whether the individual is a threat to the officers-has no bearing at all here. . . . I just can't imagine a case where the police need to administer a blood test in self-defense." *Id.*

available, and the suspect requests it, a rational jury could conclude that it is unreasonable and in violation of the Fourth Amendment for police officers to insist on a blood test.

The *Hammer* dissent relied upon California cases that have held that police are not required to give an arrestee a second opportunity to comply with the statutory requirement that they take a blood-alcohol test after their initial refusal, and that "California courts have repeatedly indicated that section 13353 does not alter the analysis of fourth amendment claims." *Id.* at 854–55 (Fernandez, J., dissenting). As such, "the outcome of [the] case is controlled entirely by *Schmerber* and its progeny." *Id.* at 855.

▮ In the case at bar, the City makes a similar argument, and the district court agreed that "the implied consent law does not create any constitutional rights to have performed, or even be informed of, any of the three testing options." While failure to advise DUI arrestees of their choice of tests appears to violate the California implied consent statute, such a failure does not violate the Fourth Amendment's reasonableness requirement. The Supreme Court has not announced a *Miranda*-type requirement that suspects be advised of their Fourth Amendment rights. *See Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (Fourth Amendment does not require a lawful detainee be advised that he is "free to go" before his consent to a search will be recognized as voluntary); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (the Fourth Amendment does not require knowledge of a right to refuse to consent to a search, nor must police advise the subject of the search of his right to refuse consent). Thus, the Fourth Amendment is not violated by the City of Irvine's failure to advise class members, who did not request or consent to a urine or breath test, of their right to choose among the alternative tests.[3] However, the City of Irvine's insistence upon obtaining blood samples from Mauricio Fernandez, Jeffrey Capler, and other class members who requested or consented to undergo breath tests instead

of blood tests was unreasonable if breath tests were actually available.

The City of Irvine mistakenly relies upon *Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), arguing that if it does not violate the Fourth Amendment to require railroad employees involved in train accidents to submit to suspicionless, duplicative tests, *i.e.,* both blood and urine tests, it cannot violate the Fourth Amendment to deny DUI arrestees the choice of one test over another.

The City of Irvine's reliance upon *Skinner* is misplaced because the Court distinguished the drug testing of railroad employees from other searches conducted by law enforcement officers:

> We have recognized exceptions to this rule, however, "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.

*Id.* at 619, 109 S.Ct. at 1414 (citations omitted). The Court cited as examples of "special needs," searches of probationers' homes, searches of the premises of highly regulated businesses, work-related searches of employees' desks and offices, searches of students' property by school officials, and body cavity searches of prison inmates. *Id.* at 619–20, 109 S.Ct. at 1414–15. It is untenable to equate the police DUI traffic stops with the pervasively regulated environments where special needs can justify even suspicionless drug testing.

In *Skinner,* the Court reviewed a testing scheme that included breath, blood and urine tests, and had the occasion to discuss each testing method individually and judge the relative invasiveness of each. That general discussion of the tests is useful here. The Court reiterated its assessment in *Schmerber* that blood tests are commonplace, and " 'society's judgment that blood tests do not consti-

---

3. The class representatives who have not alleged they requested or consented to a breath or urine test include David Nelson, David Tyler, Vicki Caruso, Kristi Giordano, Jeffrey Chancellor, Richard Heil.

tute an unduly extensive imposition on an individual's privacy and bodily integrity.'" *Id.* at 625, 109 S.Ct. at 1417–18 (quoting *Winston,* 470 U.S. at 762, 105 S.Ct. at 1617–18). However, the Court found breath tests to be less invasive:

> The breath tests authorized by ... the regulations are even less intrusive than the blood tests.... Unlike blood tests, breath tests do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment. Further, breath tests reveal the level of alcohol in the employee's bloodstream and nothing more.... [B]reath tests reveal no other facts in which the employee has a substantial privacy interest.

*Id.* at 625–26, 109 S.Ct. at 1417–18. Urine tests, on the other hand, the Court adjudged "a more difficult question" because the procedures "require employees to perform an excretory function traditionally shielded by great privacy, [and] raise concerns not implicated by blood or breath tests." *Id.* at 626, 109 S.Ct. at 1418. This court, however, has recently answered that question by stating that "requiring an arrestee to submit to a urine test is reasonable under the Fourth Amendment." *United States v. Del Edmo, 140 F.3d 1289,* (9th Cir.1998).

The City of Irvine relies upon *Vernonia School Dist. v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), for the Supreme Court's statement that "[w]e have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Id.* at 663, 115 S.Ct. at 2395–96. The City reads this declaration to mean that the relative intrusiveness of the tests is not relevant to the reasonableness inquiry, and claims the "less intrusive alternative" argument was rejected in *Skinner* as well. Although *Skinner* declined to find that the existence of less intrusive alternatives rendered suspicionless testing unreasonable under the Fourth Amendment, the Court did not reject that line of inquiry as improper or irrelevant. Instead, it noted that " 'the reasonableness of any particular government activity does not necessarily or invariably *turn* on the existence of alternative "less intrusive" means.' " *Skinner,* at 629 n. 9, 109 S.Ct. at 1419–20 n. 9 (quoting *Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983)) (emphasis added). The Court reasoned that "judges engaged in post hoc evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished," and that the "insistence on less drastic alternatives would require [the Court] to second-guess the reasonable conclusions drawn by the [government regulator] after years of investigation and study." *Id.* (quotations omitted).

In the case at bar, we need not speculate as to what less intrusive alternatives might be available. Breath and urine tests are established alternative methods which state statutes both approve as evidence and require the police to offer to DUI arrestees. No second-guessing of the California legislature is required. Further, although the intrusiveness of blood tests is a factor to be considered in the reasonableness inquiry, this case does not turn on the relative intrusiveness of the tests.

### 2. *Exigent Circumstances*

In *Schmerber,* the Supreme Court carved out an exception to the warrant requirement for blood-alcohol tests. "[T]he percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." 384 U.S. at 770, 86 S.Ct. at 1835–36. The evanescent nature of the evidence sought, and the risk of its loss during the delay while officers tracked down a magistrate to obtain a warrant, led the court to hold that no warrant was required.[4]

**4.** Alcohol typically dissipates from the human body at a rate between .015% and .018% per hour, and the scientific community agrees that rate will not exceed .022% per hour, observable in severe alcoholics. E. John Wherry, Jr., *Vampire or Dinosaur: A Time to Revisit Schmerber v. California?,* 19 Am. J. Trial Advoc. 503, 516 (1996). Using a process known as "retrograde extrapolation," the blood alcohol level of a suspect who was only barely above the California legal limit of .08% when stopped by police can be determined from a test performed 3 1/2 hours later. *Id.* at 517.

Neither side disputes that it is the rapid dissipation of alcohol from the blood of the arrestee that creates the initial exigency. When an arrestee requests but is denied the choice of an available breath or urine test, the exigency used to justify the warrantless blood test continues only because of the City's failure to perform the requested alternative test. Whenever a DUI arrestee consents to a breath or urine test, and such tests are available, the administration of either the breath or urine test would preserve the evidence and end the exigency.[5] In such cases, because the sole justification advanced to excuse the officers from obtaining a warrant disappeared when the exigency ended, the blood tests were not only unnecessary and unreasonable, but violated the Fourth Amendment's warrant requirement.

## B. Fourteenth Amendment Equal Protection Claim

"Unless a classification trammels fundamental personal rights or implicates a suspect classification, to meet constitutional challenge the law in question needs only some rational relation to a legitimate state interest." *Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990). Nelson has not alleged that the City of Irvine's policy implicates any fundamental rights or creates any suspect classifications, and instead claims the policy fails the rational basis test because it is arbitrary. "[T]he rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary." *Id.*

Nelson advances two distinct equal protection arguments alleging two different classification schemes. First, Nelson alleges the Equal Protection Clause is violated by the City of Irvine's systematic deprivation of *all* Irvine DUI arrestees' statutory rights to choose which form of alcohol test they will take. Nelson argues that because DUI arrestees stopped by law enforcement agencies elsewhere in the state "(presumably) were treated in compliance with the law," DUI arrestees in Irvine were being arbitrarily singled out and deprived of their rights.

This first theory must fail because none of the defendants through their policies created a classification scheme among those arrested within their jurisdictions. The alleged disparities in treatment across the state resulted from differences between the policies of the City of Irvine and other city, county and state law enforcement agencies.

Alternatively, Nelson argues that City of Irvine police officers required *most,* but not all, DUI suspects to submit to a blood test and their selection process was arbitrary. According to Nelson, City of Irvine police officers intentionally and arbitrarily discriminated against some DUI arrestees.

Nelson's second equal protection claim is tautological. Nelson alleges that the City of Irvine arbitrarily discriminated against a class of persons, whose defining characteristic is their having been arbitrarily required to take a blood test, by arbitrarily requiring them to take a blood test. By such reasoning, an equal protection claim would arise whenever a law was enforced with something less than perfect regularity.

## C. Fourteenth Amendment Due Process Claim

Nelson claims that the California implied consent law creates a liberty interest that is entitled to the procedural due process protections of the Fourteenth Amendment, and that the City of Irvine's policy not to give DUI arrestees the statutorily required choice of tests deprived class representatives of their right to due process.

Despite the plaintiffs' failure to raise this claim below, Nelson asks this court to consider it. We must exercise our discretion to decide whether to consider an issue raised for the first time on appeal. *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of indi-

---

**5.** We do not know of any exception to the warrant requirement other than exigency that could excuse the officers' failure to obtain warrants, and the City of Irvine has not alleged that another exception applies.

vidual cases."). "Except in the case of jurisdictional questions or where particular circumstances indicate that injustices might otherwise result or where public policy requires, this Court declines to consider arguments for reversal not presented to the district court." *In re U.S. Financial, Inc.,* 594 F.2d 1275, 1282 (9th Cir.1979).

No jurisdictional question is involved here. Nor has Nelson set forth reasons why public policy requires us to consider this argument which was not presented to the district court. Injustice might result from an appellate court's failure to consider an argument that would affect an appellant's determination of guilt or length of incarceration. Nelson does not contend, however, that if each class member were given his choice of tests he would not have been found to be intoxicated. Nelson therefore points to no injustice that might result from our failure to consider the due process argument raised for the first time on appeal. Accordingly, we decline to consider Nelson's Fourteenth Amendment due process claim.

## III. State Law Claims

### A. California Civil Code § 52.1

■ Nelson alleged that City of Irvine police officers, by threats and coercion, interfered with the arrestees' rights secured by the U.S. Constitution and the California implied consent statute, in violation of California Civil Code § 52.1. That section provides in relevant part:

(a) Whenever a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise of enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General ... may bring a civil action for injunctive or other appropriate equitable relief....

(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as de-

scribed in subdivision (a), may institute and prosecute ... a civil action for damages....

Cal. Civ.Code § 52.1 (West 1997).

The district court dismissed Nelson's claim under California Civil Code § 52.1 because Plaintiffs "fail[ed] to allege Defendants interfered with their legal rights due to Plaintiffs' 'race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute.'" Order at 5 (quoting *Boccato v. City of Hermosa Beach,* 29 Cal.App.4th 1797, 35 Cal.Rptr.2d 282 (Ct.App.1994)). In *Boccato,* the California Court of Appeal held that to state a claim under § 52.1, plaintiffs must allege that the interference with the plaintiff's rights by means of threats, intimidation or coercion was "because of" their membership in a protected classification. *Id.* at 290.

The court of appeal that decided *Boccato* acknowledged that the text of § 52.1 does not contain the limitation it imposed, but reasoned that because the statute was enacted to stem the tide of hate crimes, it must be read in conjunction with Cal. Civ.Code § 51.7, a separate provision which establishes the right of all persons to be free of "violence, or intimidation by threat of violence, committed against their persons or property because of their [membership in a protected classification]." *Id.*

■ Believing *Boccato* to be erroneous, Nelson asks this court to interpret the statute literally, without the restriction to protected classifications imposed by *Boccato.* Because this is a state law issue which has been squarely decided by a state appeals court, we are restricted in our power to do as Nelson urges.

When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. However, where there is no convincing evidence that the state supreme court would decide differently, a federal

court is obligated to follow the decisions of the state's intermediate appellate courts. *In re Bartoni–Corsi Produce, Inc.*, 130 F.3d 857, 861 (9th Cir.1997).

The California Supreme Court denied review of *Boccato,* and has discussed § 52.1 in two subsequent decisions, *Jones v. Kmart Corp.*, 17 Cal.4th 329, 70 Cal.Rptr.2d 844, 949 P.2d 941 (1998), and *In Re M.S.*, 10 Cal.4th 698, 42 Cal.Rptr.2d 355, 896 P.2d 1365 (1995). Neither of these cases, nor any source Nelson has identified, presents convincing evidence that the California Supreme Court would decide the issue differently from *Boccato.* Because *Boccato* is a decision from California's intermediate appellate court, under these circumstances we are obligated to follow it and affirm the district court's dismissal of Nelson's § 52.1 claim.

### B. Assault and Battery

The district court dismissed Nelson's battery claim because "the touching was consensual" as a matter of law under the California implied consent law which provides that any "person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood, breath, or urine." Cal. Veh.Code § 23157(a)(1). Consent is a complete defense to a battery claim. *Ashcraft v. King,* 228 Cal.App.3d 604, 278 Cal.Rptr. 900, 902 (Ct.App.1991). However, the next paragraph of the statute provides that a person lawfully arrested for DUI "has the choice of whether the test shall be of his or her blood, breath, or urine, and the officer shall advise the person that he or she has that choice." *Id.* at § 23157(a)(2)(A). The issue, then, is whether § 23157(a)(1) implies consent to any and all tests law enforcement officers choose to employ, or only the test selected by the arrestee.

Sections of statutes should be construed consistently with other statutory sections whenever possible. *See United States v. Bear,* 932 F.2d 1279, 1280–81 (9th Cir. 1990) (as amended). Section 23157(a)(2)(A) permits DUI arrestees a choice of tests, and the California law has been construed to provide that an arrestee is entitled to just one test, *Kesler v. Dept. of Motor Vehicles,* 1 Cal.3d 74, 81 Cal.Rptr. 348, 459 P.2d 900 (1969). Thus, only consent to the selected

test need be implied under § 23157(a)(1). Because the parties who requested breath tests impliedly consented only to that means of testing, they did not impliedly consent to a blood test and their battery claims are not defeated by virtue of consent to the allegedly harmful or offensive contact.

### Conclusion

When an arrestee has agreed to submit to a breath or urine test which is available and of similar evidentiary value, the government's need for a blood test disappears. Under such circumstances, it is unreasonable to require a blood test and the Fourth Amendment is violated. Further, when a DUI suspect agrees to take an available alternative test of equal evidentiary value, the risk that evidence will be lost disappears and the exigent circumstance that excused the police from obtaining a warrant likewise disappears, rendering a warrantless nonconsensual blood test in such circumstances unconstitutional.

Taking the plaintiffs' allegations as true, as we must when reviewing a dismissal under Federal Rule of Civil Procedure 12(c), it was unreasonable to require Mauricio Fernandez to submit to a blood test after he agreed to take "whatever breath test he had to" and to require Jeffrey Capler to submit to a blood test after he requested a breath test. Therefore, concluding that Mauricio Fernandez and Jeffrey Capler failed to allege facts sufficient to make out a constitutional violation and a claim under 42 U.S.C § 1983 was erroneous.

The Supreme Court, however, has "long held that the 'touchstone of the Fourth Amendment is reasonableness,'" *Robinette,* 519 U.S. at ——, 117 S.Ct. at 421, which "is measured in objective terms by examining the totality of the circumstances." *Id.* Factual development at trial may affect the ultimate determination whether the plaintiffs' requests for alternative forms of testing, which the police refused to respect, were in fact reasonable under the circumstances.

Further, plaintiffs, as a matter of law, stated a valid claim for common law assault and battery. California's implied

consent statute, which includes a provision allowing the arrestee a choice of tests, implies consent to the selected test, not whichever test law enforcement officials may choose to employ in violation of the statute.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.