**ASSURANCE COMPANY OF AMERICA, a Maryland corporation, Plaintiff–Appellee,**

v.

**WALL & ASSOCIATES LLC OF OLYMPIA, a Washington corporation, Defendant–Appellant.**

No. 02–35992.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2004.

Filed Aug. 5, 2004.

John T. Petrie, Esq., Seattle, WA, for the appellant.

Jerret E. Sale, Esq., Seattle, WA, for the appellee.

Before: BRUNETTI, McKEOWN, and GOULD, Circuit Judges.

BRUNETTI, Circuit Judge:

Appellant Wall & Associates ("Wall") appeals the district court's grant of Assurance Company of America's ("Assurance") motion for summary judgment and the denial of Wall's cross-motion for summary judgment. In this contract interpretation case, the district court concluded that the policy language for collapse coverage required a "sudden falling down," which, the court found, Wall did not demonstrate. As there was no collapse and thus no coverage, the district court also deemed all of the collateral issues moot or irrelevant.

The district court erred in interpreting the term "collapse" in isolation; the collapse provision contains additional language indicating an intent to extend broader coverage. We hold, therefore, that the collapse provision here provides coverage not only for actual collapse but also for imminent collapse. In light of our decision, the case must be remanded for the district court to consider the remaining issues raised in the parties' motions for summary judgment.

## I. Background

Wall owns the Percival Plaza, which consists of two buildings built respectively in 1989 and 1990. The buildings' structures consist of steel columns and steel beams with open-web joists. Attached to the steel frames are wooden exterior wall framing studs covered by exterior-grade gypsum sheathing. The buildings' exterior siding is a polystyrene foam wall system called "External Insulation Finishing System" (EIFS), which is attached to the gypsum sheathing, and a decorative brick facade is attached to the outer layer of the EIFS by use of an adhesive. The use of EIFS was a relatively new construction method at the time the Percival Plaza was built.

Soon after construction was completed, Wall began experiencing problems with leaking water in the building. The leaks primarily involved certain windows on the southwest side of the building; in the first couple of years the worst leaking occurred on the second floor, and then leaks began surfacing on the third floor sometime in 1998. Wall took some steps to correct the problem, including re-caulking at certain places in the early 1990s and applying elastomeric paint in 1996. Nick Adams, Wall's property manager, testified at his deposition that by 1998 the leaks seemed restricted to one tenant's space and that, after the application of the elastomeric paint in 1996 and a couple dryer-than-average winters in 1996 and 1997, "[w]e thought we had beaten the problem."

Leaks reappeared, however, in the spring of 1999, and Wall retained an architect and a construction repair specialist to investigate further the water leakage problems at the Percival Plaza. Extensive testing revealed that the buildings had decayed and deteriorated as a result of the water intrusion. The gypsum sheathing had turned to mush, leaving only the paper facing intact, which provided the sole support for the EIFS. The September 21, 1999, report also concluded that the state of the EIFS created a serious risk to

passersby as the EIFS was in danger of completely falling off the building. The report recommended removing and replacing the EIFS cladding and brick panel facades on the west and south sides of the building. The architect testified, however, that there was really no way to tell when, if ever, the EIFS would fall. Upon commencement of the repairs and scoring of the walls, Wall discovered the extent of the damage to the buildings' exterior. With the slightest touch, the brick facades simply fell off the building; indeed, Wall partner Don Carlson testified, "you could just finger them off."

The Assurance policy at issue began on March 25, 1999. Wall submitted a notice of loss to Assurance in June 1999. Several months after the remedial work was completed, Wall submitted its first Sworn Statement in Proof of Loss to Assurance. Wall sought coverage for collapse loss and described the cause of the damage as "deterioration of gypsum wall-board forming substrate of exterior wall system, creating high risk of failure of structural support for brick facing." Wall claimed on this form that it discovered the damage on April 22, 1999, and stated the amount of its loss was $493,924.92. In March 2001, Wall submitted an amended claim in the amount of $529,665.21. Assurance denied Wall's claim on the basis that there had been no covered collapse.

The Assurance policy provided both property and liability coverage. The policy stated that it provided coverage for "[r]isks of direct physical loss or damage unless the loss or damage is excluded or limited as described. . . ." Under the heading, "Exclusions," the policy said, "We will not pay for loss or damage caused directly or indirectly by . . . (j) Collapse." "But[,]" the policy immediately continued,

(1) If collapse results in a Covered Cause of Loss at the "described premises," we will pay for the loss or damage caused by that Covered Cause of Loss.

(2) We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

(a) The "specified causes of loss" . . .;

(b) Hidden decay. . . .

The policy defined "Specified Causes of Loss" to include water damage, "meaning accidental discharge or leakage of water . . . as the direct result of the breaking or cracking of any part of a system or appliance containing water. . . ." The policy also specified that "collapse does not include settling, cracking, shrinkage, bulging or expansion."

Following the denial of Wall's claim, Assurance filed the instant declaratory judgment action in the Western District of Washington, seeking clarification of a number of issues, including whether Wall is entitled to coverage under the exception to the collapse exclusion, and if so, whether coverage is nonetheless precluded by the "known loss doctrine"; whether the covered loss occurred during the coverage period; whether Wall filed its proof of loss within the specified limitations period; and whether any other policy exclusions foreclose Wall's claim. After both parties filed motions for summary judgment, the district court granted Assurance's motion, holding that, in the context of the policy at issue, "collapse" was an unambiguous term which meant "a sudden falling down"; and because "[t]here was no sudden falling down of the wall or of the EIFS of the Percival Plaza building," the court concluded, there was no coverage for collapse. Given that conclusion, the court deemed the other issues moot or irrelevant.

560

## II. Discussion

### a. *Standard of Review*

We review a grant of summary judgment de novo. *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 410(9th Cir. 1996). "Summary judgment is available only if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mercer Place Condo. Ass'n v. State Farm Fire & Cas. Co.*, 104 Wash.App. 597, 17 P.3d 626, 628(Wash.Ct.App.2001). "In reviewing a summary judgment order, this court conducts the same inquiry as the trial court." *Id.* "Construction of a contractual insurance policy provision is a question of law and therefore subject to de novo review." *Id.* (citing *Queen City Farms v. Central Nat'l Ins. Co.*, 64 Wash.App. 838, 827 P.2d 1024, 1032 (1992), *aff'd*, 126 Wash.2d 50, 882 P.2d 703 (1994)).

Moreover, "[w]hen interpreting state law, federal courts are bound by decisions of the state's highest court." *Nelson v. City of Irvine*, 143 F.3d 1196, 1206 (9th Cir.1998). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* And, "where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Id.* at 1206–07.

### b. *Collapse Coverage*

■ "In construing the language of an insurance policy, the entire contract must be construed together so as to give force and effect to each clause." *Mercer Place*,

17 P.3d at 629 (quoting *Transcont'l Ins. Co. v. Utils. Sys.*, 111 Wash.2d 452, 760 P.2d 337, 340 (1988)). "An inclusionary clause in insurance contracts should be liberally construed to provide coverage whenever possible." *Id.* at 629(quoting *Riley v. Viking Ins. Co. of Wis.*, 46 Wash. App. 828, 733 P.2d 556, 558 (1987)). "[E]xclusionary clauses are to be construed strictly against the insurer." *Eurick v. Pemco Ins. Co.*, 108 Wash.2d 338, 738 P.2d 251, 252 (1987). "Overall, a policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective." *Mercer Place*, 17 P.3d at 629(quoting *Transcont'l Ins. Co.*, 760 P.2d at 340). "However, 'a clause or phrase cannot be considered in isolation, but should be considered in context, including the purpose of the provision.' " *Id.* (quoting *Riordan v. Commercial Travelers Mut. Ins. Co.*, 11 Wash.App. 707, 525 P.2d 804, 807 (1974)).

■ "If the language is clear and unambiguous, a court must enforce it as written and may not modify it or create ambiguity where none exists." *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wash.2d 654, 15 P.3d 115, 122 (2000). "It is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves." *Chaffee v. Chaffee*, 19 Wash.2d 607, 145 P.2d 244, 252 (1943).

If the clause is ambiguous, however, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it

is fairly susceptible to two different interpretations, both of which are reasonable.

*Weyerhaeuser Co.*, 15 P.3d at 122.

█ The district court here stated that the Washington courts have not interpreted the word "collapse" in the context of insurance coverage. Indeed, in *Panorama Village Condominium Owners Association Board of Directors v. Allstate Insurance Company*, 144 Wash.2d 130, 26 P.3d 910 (2001), the Washington Supreme Court came close to rendering an interpretation of a collapse provision similar to that present here; however, the outcome of that case turned on the construction of the policy's requirement that the insured bring suit within one year after the loss occurred. *Id.* at 912. Nonetheless, as Wall points out, the court necessarily had to find that the policy in question extended coverage for the plaintiff's loss before it could go on to reach the timing issue.

In *Panorama Village*, the plaintiffs owned a four-building complex, which, over the course of its existence, demonstrated a history of maintenance problems. *Id.* After the building began experiencing an increase in maintenance problem reports, a team of investigators headed by an architect conducted a walk-through investigation at the Panorama Village complex. *Id.* Because the architect was unable to determine on the basis of the walk-through the presence of hidden decay, he recommended a program of selective demolition. *Id.* This selective demolition required the team to remove exterior siding from the complex, and, with the siding removed, the architect was able to examine the structural support of the building. *Id.* He then determined the complex was at risk of collapse due to dry rot. *Id.*

The policy in *Panorama Village* included similar language regarding collapse as present here; namely, the policy provided

an exception to the collapse exclusion that stated, "We will pay for risk of direct physical loss involving collapse of a covered building or any part of a covered building caused only by one or more of the following: ... b. hidden decay." *Id.* at 912–13. The policy also provided: "Persons insured also agree to bring any action against us that relates to Coverage A within one year after a loss occurs." *Id.* at 913. In interpreting these two provisions together, the court said:

> We construe this insurance contract to mean exactly what it says. Where a policy protects against risk of direct physical loss from hidden decay and requires the insured to bring suit within one year after a loss occurs, the date of loss is the earlier of either (1) the date of actual collapse or (2) the date when the decay which poses the risk of collapse is no longer obscured from view.

*Id.* at 912. Thus, by stating that a loss could occur either when the building actually collapsed *or* when decay posed a risk of collapse, the court implied that Washington law does not require actual collapse in policies providing coverage "for risk of direct physical loss involving collapse of a covered building or any part of a covered building." We find this implicit holding of the Washington Supreme Court most persuasive in concluding that the collapse provision at issue here does not limit coverage solely to damages resulting from an actual collapse.

Although the Washington Court of Appeals has not directly interpreted the language at issue either, we find the language of *Mercer Place* instructive. "A growing majority of jurisdictions have assigned the more liberal standard, 'substantial impairment of structural integrity,' to the use of 'collapse' in insurance policies, as opposed to the minority view, which requires that the structure actually fall down." *Id.* at 629 n. 1. Moreover, the court mentioned

that United States District Court Judge for the Western District of Washington Barbara Rothstein "predicted that the Washington Supreme Court, if called upon to interpret a collapse provision in an insurance policy, would adopt the majority 'substantial impairment' standard." *Id.* (citing *Allstate Ins. Co. v. Forest Lynn Homeowners Ass'n*, 892 F.Supp. 1310, 1314(W.D.Wash.1995), *opinion withdrawn*, 914 F.Supp. 408 (W.D.Wash.1996)).

Other jurisdictions that have interpreted similar collapse provisions directly have come to the same conclusion; although these cases are not binding on the Washington courts, they provide guidance as to other jurisdictions' treatment of such provisions and instruct this court as to how the Washington Supreme Court might opt to construe a similar collapse provision if called upon to do so directly in the future. In *Whispering Creek Condominium Owner Association v. Alaska National Insurance Company*, 774 P.2d 176 (Alaska 1989), for example, the Supreme Court of Alaska faced the interpretation of policy language similar to that present here: "This policy insures against risk of *direct physical loss involving collapse* of a building or any part of a building *caused* only *by* one or more of the following: ... b. *hidden decay.*" *Id.* at 178. There, as here, the insured building had not actually fallen to the ground, but rather its roof was "in immediate danger of complete collapse." *Id.* at 179. After reviewing decisions from several other jurisdictions, the court concluded, "In view of the undisputed evidence that the Whispering Creek complex was in a life-threatening condition and in imminent danger of collapse, we conclude that the damage producing this less than total collapse is covered under the collapse provision of the policy." *Id.* at 180.

A California intermediate court also assigned a broader definition to "collapse" in *Doheny West Homeowners' Association v. American Guarantee and Liability Insurance Company*, 60 Cal.App.4th 400, 70 Cal. Rptr.2d 260 (1997). There, a structural engineer inspected the pool and parking structure and, finding extensive damage, recommended that the pool be emptied of water as soon as possible because "an earthquake of large magnitude could cause a complete collapse of the pool." *Id.* at 403, 70 Cal.Rptr.2d 260. As here, the policy in *Doheny West* excluded coverage for collapse, with the exception that the policy provided, "We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following: 1. The 'specified causes of loss' ...; 2. Hidden decay ...." *Id.* at 402, 70 Cal.Rptr.2d 260. Also, as here, the *Doheny West* policy defined "specified causes of loss" to include water damage, and defined "water damage" to mean "accidental discharge or leakage of water ... as the direct result of the breaking or cracking of any part of a system or appliance containing water ...." *Id.* The policy also provided that "collapse does not include settling, cracking, shrinkage, bulging or expansion." *Id.*

In interpreting the policy language as a whole, the court concluded that the exception to the collapse exclusion covered actual or imminent collapse. *Id.* at 403, 70 Cal.Rptr.2d 260. The court noted that such interpretation avoided the unreasonable result of "requir[ing] an insured seeking the benefits of its insurance coverage to neglect repairs and allow a building to fall, a course of action which could not possibly comport with the expectation and intent of the insured, or advance the best interests of the insured, the public, or even the insurer ...." *Id.* at 404, 70 Cal.Rptr.2d 260.

Moreover, the court reasoned, an interpretation requiring actual collapse would

be inconsistent with the policy language. *Id.* In so doing, the court noted that its task was "to construe not merely a single word, 'collapse,' but the entire coverage clause." *Id.* The court emphasized that it was undisputed that the clause covered "collapse of a building, that is, that there is coverage if a building falls down or caves in." *Id.* The court also found that the clause, "risks of direct physical loss involving collapse of a building," does not limit itself to " 'collapse of a building,' but covers 'risk of loss,' that is, the threat of loss." *Id.* "[W]ith the phrases 'risk of loss,' and 'involving collapse,' the policy broadens coverage beyond actual collapse." *Id.; accord Rosen v. State Farm Gen. Ins. Co.,* 30 Cal.4th 1070, 135 Cal.Rptr.2d 361, 70 P.3d 351 (2003) (restricting coverage to actual collapse when policy specified, "We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building," and defined "collapse" as "actually fallen down or fallen into pieces").

The policy language at issue here comprehends a broader meaning than what the district court assigned. As noted above, the entire contract must be construed together so as to give force and effect to each clause. *See Mercer Place,* 17 P.3d at 629. The policy here states, "We will pay for loss or damage caused by or resulting from *risks of direct physical loss involving collapse* of a building or any part of a building caused … by … hidden decay." (Emphasis added). The term "collapse" does not appear in the policy in isolation; instead, it is qualified by the terms "risks of direct physical loss" and "involving." Certainly, as in *Rosen,* if the policy specified, "We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building," and, in turn, defined "collapse" as "actually fallen down or fallen into pieces," the district court would have

properly attributed to the word "collapse" the definition of "a sudden falling down." However, as in *Panorama Village, Whispering Creek,* and *Doheny West,* the clause here contains much more. To interpret the clause as a whole to mean that coverage extends only upon "a sudden falling down" impermissibly disregards the other aspects of the clause and renders them ineffective. *See Mercer Place,* 17 P.3d at 629; *Doheny West,* 60 Cal.App.4th at 405, 70 Cal.Rptr.2d 260.

Thus, even if the district court properly defined the *word* "collapse" to mean "a sudden falling down," it erred in ending the inquiry there; the court should have then considered the rest of the clause's language to ascertain its practical and reasonable interpretation. *See Mercer Place,* 17 P.3d at 629; *Doheny West,* 60 Cal. App.4th at 405–06, 70 Cal.Rptr.2d 260. We therefore conclude that this policy language not only covers actual collapse but also imminent collapse. *See Doheny West,* 60 Cal.App.4th at 406, 70 Cal.Rptr.2d 260. This approach gives force and effect to each term in the clause. *See Mercer Place,* 17 P.3d at 629.

### III.  Conclusion

We conclude therefore that the district court erred in interpreting the term "collapse" in isolation and, in turn, failing to consider the other terms of the provision. Because we hold that the collapse provision here provides coverage not only for actual collapse but also for imminent collapse, on remand, the district court is instructed to assess the facts presented in the parties' respective cross motions for summary judgment using such interpretation.

REVERSED and REMANDED.