SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. AZ-16-1337-JuLB |
| ERIK SAMUEL DE JONG and DARYL LYNN DE JONG, | Bk. No. 2:14-bk-00886-PS |
| Debtors. | |
| ERIK SAMUEL DE JONG; DARYL LYNN DE JONG, | |
| Appellants, | |
| v. | **M E M O R A N D U M**[*] |
| JLE-04 PARKER, LLC, | |
| Appellee. | |

Argued and Submitted on May 18, 2017
at Phoenix, Arizona

Filed - June 2, 2017

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Paul Sala, Bankruptcy Judge, Presiding

_____

Appearances: Michael W. Carmel argued for appellants Erik Samuel de Jong and Daryl Lynn de Jong; Lindsi M. Weber of Gallagher & Kennedy argued for appellee JLE-04 Parker, LLC.

_____

Before: JURY, LAFFERTY, and BRAND, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

-1-

Appellants-debtors, Erik Samuel de Jong (Erik) and Daryl Lynn de Jong (collectively, Debtors), operated a dairy farm on real property leased from chapter 11[1] debtor Sonora Desert Dairy, LLC (Sonora Desert). During Sonora Desert's bankruptcy, the property was foreclosed upon and sold at a trustee's sale to appellee-creditor, JLE-04 Parker, LLC (JLE), thereby extinguishing Debtors' leasehold interest under Arizona law. Debtors refused to vacate the property.

JLE filed a forcible entry and detainer proceeding (FED) against Debtors in the Arizona state court. On the eve of trial, Debtors filed a chapter 11 petition. After JLE obtained relief from the automatic stay, the state court found Debtors' leasehold interest was extinguished by the trustee's sale. JLE then sought relief in the bankruptcy court to have Debtors vacate the property. Debtors contended that they needed months to move their cows and silage (feed) off the property. JLE objected, asserted Debtors were trespassers, and claimed millions of dollars in damages for Debtors' conscious and continuing trespass, which were embodied in a proof of claim (POC). The POC sought damages of $8,863,250.00, which included, among other things, restitution damages for disgorgement of profits. JLE later filed an Application for Administrative Priority Claim (Administrative Claim) for $7,900,000.00 for damages allegedly incurred due to Debtors' postpetition

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

trespass.

After Debtors objected to JLE's POC and Administrative Claim, the matter proceeded to trial to liquidate JLE's damages. In a memorandum decision, the bankruptcy court concluded that JLE had a prepetition claim for $558,716.24 and a postpetition administrative claim for $1,517,069.64. JLE filed a motion for clarification on the calculation of damages, and Debtors filed a motion for reconsideration. The bankruptcy court granted JLE's motion in part and denied Debtors' motion. On September 30, 2016, the bankruptcy court entered an amended order on JLE's POC finding that JLE had a prepetition claim in the amount of $579,072.51 and a postpetition administrative claim for $1,571,916.11. This appeal followed.

For the reasons explained below, we AFFIRM the bankruptcy court's findings regarding Debtors' conscious trespass in the pre and postpetition periods. We VACATE the bankruptcy court's postpetition damage award and REMAND for a calculation of damages consistent with this memorandum.

## I. FACTS[2]

### A. Prepetition Events

Sonora Desert owned three properties referred to throughout this case as Dairy I, Dairy II, and Dairy III. Debtors entered into a lease agreement dated February 27, 2012 (February 27, 2012 Lease), with Sonora Desert and Robert Lueck (Lueck), its managing member. The lease was for Dairy I with monthly rent of $30,000 and a term of three years with an option to extend.

---

[2] Most of the background facts are set forth in the bankruptcy court's memorandum decision.

-3-

Debtors used the property, located in Buckeye, Arizona, to run their business known as Valkyrie Dairy.

When Debtors entered into the lease agreement, Sonora Desert was a chapter 11 debtor-in-possession in a bankruptcy case filed in the District of Arizona.[3]  Lueck advised Erik that the bankruptcy court had to approve the lease before Debtors moved onto Dairy I.  Debtors did not wait for court approval, instead moving 1649 cows onto Dairy I one day after they signed the lease.

In a matter of days, Debtors executed a new lease for Dairy I dated March 1, 2012 (March 1 Lease).  The March 1 Lease provided that either party could terminate the lease upon 180 days written notice to the other party.  Section 18.1 of the lease gave Debtors the right of first refusal if Sonora Desert or Lueck sought to sell Dairy I and its other dairy properties.[4]

On May 29, 2012, the bankruptcy court in Sonora Desert's case approved the March 1 Lease with some variations (Sonora Order).  The Sonora Order provided, among other things, that Debtors, as lessees, acknowledged that the lessors were currently marketing Dairy I for sale and also that the March 1 Lease was junior to a first priority deed of trust held by Agstar and a second priority Wells Fargo replacement lien.  The Sonora Order also clarified that the March 1 Lease provided that

---

[3] Sonora Desert's case was substantively consolidated with the cases of Sonora Desert Dairy II, LLC, Sonora Desert Dairy III, LLC, Lueck Cattle Company, LLC, and Bob Lueck Farms, LLC.

[4] The right of first refusal pertained to all three properties.

-4-

Debtors would pay $2,615.42 per month for real estate taxes on the Dairy I property and $921.46 in real estate taxes on the nine residential housing units also located on the property. The order further amended the March 1 Lease, reducing the time period for Debtors to exercise their right of first refusal if the leased property were sold.

About a year later, in May 2013, Erik communicated with Brian Van Leeuwen about leasing his dairy farm (Van Leeuwen Property) to Debtors. Erik learned that if he moved his dairy operation to the Van Leeuwen Property he would not have room for all his cows.

Lueck mailed Debtors a Notice of Termination (NOT) dated May 30, 2013, which stated that the March 1 Lease would terminate on November 30, 2013.[5] In September 2013, Mr. Havranek, the real estate broker hired to help Sonora Desert sell its properties, advised Erik that a trustee's sale of the property was set for December 6, 2013.

On October 16, 2013, Sonora Desert's attorney, Mr. May, mailed and emailed a letter to Erik reminding him of the termination of the March 1 Lease and the need to vacate Dairy I. Debtors made no plans to move from the property.

At the December 6, 2013, trustee's sale, JLE purchased Dairy I, Dairy II, and Dairy III for $6,936,264.02. Erik and

[5] Whether Debtors received proper notice for termination of the March 1 Lease is not at issue in this appeal. The bankruptcy court found that Debtors' trespass began December 6, 2013, the date of the trustee's sale, and ended when they vacated the Property on May 31, 2014. The court calculated JLE's damages based on that time period.

other family members attended the trustee's sale but did not bid. The sale included the real property and fixtures used to operate dairy farms at the Sonora Dairies. The trustee's sale extinguished any leasehold interest or any other interest that Debtors had in Dairy I as of December 6, 2013.

JLE purchased the properties using all of the funds available to it from a 1031 exchange sale; a $1,000,000 loan from Mr. Accomazzo/Ambien Dairy; and loans from the families of Joseph Echeverria and Chad Odom. JLE leased Dairy II to the Accomazzo/Ambien Dairy entity for no rent through May 2014 and for $15,000.00 per month thereafter. JLE leased Dairy III to Rio Loco for $50,000.00 per month.

About a week after the trustee's sale, Mr. Echeverria and Mr. Odom had multiple conversations with Erik confirming their prior communications that JLE did not want to enter into a lease or other arrangement with Debtors and that Debtors needed to vacate the Dairy I property. Mr. Odom and Mr. Echeverria made various proposals to Erik for a reasonable and rapid exit from the property. Erik made no proposals to leave and after further conversations, Erik insisted he did not have to leave because of the March 1 Lease and his belief that no court would remove him from the Dairy I property.

JLE's counsel served Debtors with a notice and demand letter dated December 20, 2013, in which JLE's counsel notified them of JLE's purchase and current ownership of the property and explained that any right of possession had been terminated by the NOT and trustee's sale. The letter gave notice that any remaining tenancy or leasehold interest that Debtors had in the

-6-

Property was terminated immediately. Finally, it informed Debtors that as a holdover tenant at will, they would be liable to JLE for a fair market rental value of the property from the date of ownership through the date Debtors vacated. JLE asserted a right to recover $30,000 in monthly rent plus other expenses. In the end, JLE demanded that Debtors vacate Dairy I by January 14, 2014, and if they did not do so, JLE would file a FED action against them.

Debtors responded to the letter by sending a copy of the February 27, 2012 Lease to JLE's counsel. This was not the lease that was approved by the bankruptcy court in the Sonora Order.

On January 7, 2014, JLE's counsel faxed and emailed Debtors another notice and demand, informing them that the January 14, 2014 date was a typographical error and that they needed to vacate Dairy I by January 4, 2014. The notice informed Debtors that JLE would file a FED action against them on January 9, 2014, if they did not comply. Debtors refused to vacate the property.

Prior to the filing of Debtors' bankruptcy petition, Erik was worried about the loss of the value of Debtors' silage, which would be worthless if Debtors were forced to move. To preserve the value of the silage, Erik identified three potential exit plans and settlement proposals which he communicated to JLE: (i) sell the feed silage and other feed inventory to JLE and auction the cattle by the end of February 2014; (ii) feed the silage and other feed inventory to his cattle and, when exhausted, auction the cattle and likely occupy

-7-

the property until at least the end of July; or (iii) move to another dairy, if he could find an affordable dairy, after selling or using the silage and feed inventory.

JLE filed the FED action on January 9, 2014. Prior to the scheduled January 23, 2014 trial in the FED action, Thomas de Jong, Erik's father, made an offer on Debtors' behalf to sell Debtors' cows and feed to JLE. JLE declined. In addition, counsel for Debtors, Reed Haddock, presented an exit plan settlement proposal to JLE. On January 21, 2014, Mr. Haddock advised Erik and his father that JLE had not responded to the proposal and that there was a good chance that JLE would prevail in getting a restitution order.

**B.    Bankruptcy Events**

On January 23, 2014, Debtors filed a chapter 11 petition which stayed the FED action. On the petition date, Debtors owned or leased approximately 3538 cows worth $2,178.85 per head.

**1.    JLE's Emergency Motion For Relief From Stay**

JLE filed an emergency motion seeking a determination that the automatic stay did not apply or, in the alternative, for relief from the automatic stay to proceed with the FED trial.[6] The bankruptcy court modified the stay by order entered on February 13, 2014, allowing the state court to hold the FED trial and to decide the issue regarding Debtors' right to possession, including whether the trustee's sale extinguished the March 1 Lease under Arizona law. At the stay relief

---

[6] JLE also sought to dismiss the bankruptcy case.

hearing, the bankruptcy court had observed that the Sonora Order stated that Debtors' leasehold interest was subordinated to the first deed of trust and replacement lien and, therefore, the March 1 Lease would be affected by the trustee's sale.

The stay relief order stated that the parties should provide the state court with a copy of the Sonora Order and ordered JLE not to pursue a writ of restitution or otherwise enforce the judgment until further hearings in the bankruptcy court. Finally, the order prohibited JLE from removing or repossessing any of the livestock, personal property, or feed existing on the Dairy I property as of the petition date without a further order from the bankruptcy court.

### 2. The FED Trial

The state court held the FED trial on March 10, 2014, and took the matter under advisement. On March 13, 2014, the state court issued a minute entry ruling in JLE's favor. The state court found that Debtors' leasehold interest was terminated by the nonjudicial foreclosure of the deed of trust. Accordingly, the state court concluded that when Debtors continued in possession they became tenants at sufferance and remained on the property "without any right to be there." The state court further found that the notices sent by JLE on December 20, 2013, and January 7, 2014, met or exceeded the procedural requirements for notice and demand of possession. In the end, the court concluded that Debtors were guilty of forcible detainer.

### 3. JLE Sells Dairy I

On February 5, 2014, JLE signed a Purchase and Sale Agreement and opened escrow to sell the Dairy I property to

-9-

G & K Land & Cattle, LLC (G&K) for $2,228,006.12. Escrow was scheduled to close on the earlier of (a) December 31, 2014, or (b) ten (10) days following written notice from the buyer to the seller and escrow agent. On September 5, 2014, JLE and G&K executed a first amendment to the Purchase and Sale Agreement. The purchase price did not change. Escrow closed on September 29, 2014, at the purchase price of $2,228,006.12.

### 4.    The March 18, 2014 Hearing

After the ruling in the FED action, JLE filed a motion in the bankruptcy court to expedite consideration of that ruling, seeking to compel Debtors to vacate Dairy I. At the March 18, 2014 hearing, Debtors argued that they needed to remain on the property until June 1, 2014. JLE objected and put Debtors on notice that their failure to vacate the property exposed them to continuing damages for trespass and other claims. The bankruptcy court acknowledged that JLE claimed damages as a result of Debtors' delay in vacating the property and set a pretrial schedule to address those damages. In the end, the bankruptcy court concluded that Debtors must vacate the property on June 1, 2014, unless JLE notified the court that an earlier date was warranted. The bankruptcy court also told JLE to file its POC.

After this hearing, on March 26, 2014, Erik sent a text message to Mr. Accomazzo, the principal of JLE's purchaser for Dairy I. In the message, Erik indicated that he got exactly what he wanted from the bankruptcy court and that he was "making a sh\*\*load of money off his cows."

### 5. Debtors Object To JLE's POC

On March 28, 2014, JLE filed its POC, asserting damages in the amount of $8,863,240.00, including, among other things, disgorgement of Debtors' profits and its own lost profits due to Debtors' trespass. Debtors objected to the POC, arguing that JLE was not entitled to a claim for disgorgement of profits or lost profits under any legal theory. In reply, JLE claimed over $2 million in its lost profits and sought disgorgement of Debtors' profits in the amount of approximately $4.8 million. JLE argued that under Arizona law, it was entitled to recover for any physical damages to the property, the cost of restoring the property, the fair market rental value of the land during Debtors' trespass, as well as compensation for annoyances and damages for loss of use of the Property. JLE further asserted that it was entitled to its actual/compensatory damages as a result of Debtors' trespass and that those damages included lost profits of JLE. Finally, JLE argued that under the Restatement (Second) of Torts, disgorgement of Debtors' profits was an appropriate element of damages as a result of Debtors' trespass.

### 6. The April 2, 2014 Hearing

Apparently displeased with the March 18, 2014 ruling, JLE sought an expedited hearing in the bankruptcy court by filing a Motion for Clarification and Supplemental Relief Re: Court's Ruling Regarding Debtors' Continuing Trespass and Wrongful Possession. At the April 2, 2014 hearing on the matter, the bankruptcy court reiterated that Debtors would leave the property by June 1, 2014. The bankruptcy court also appointed an onsite manager at JLE's request to make sure Debtors left the

-11-

property by that date.

By May 31, 2014, Debtors had moved all of their cows from Dairy I and were no longer operating their business on the property.

**7.  Cross Motions For Summary Judgment on JLE's POC**

Meanwhile, Debtors filed a motion for summary judgment (MSJ) on their objection to JLE's POC.  They argued, as a matter of law, they were not trespassers because (1) they entered the Dairy I property pursuant to the terms of a valid lease which was approved by the bankruptcy court in Sonora Desert's bankruptcy case and (2) the bankruptcy court directed that Debtors remain on the property and operate their business. Debtors further maintained that under Arizona law, JLE could recover damages for rent, or a fair and reasonable satisfaction for the use and occupation of the property.

JLE filed a cross MSJ.  JLE argued that, as a matter of law, the state court conclusively established that Debtors were in wrongful possession of the Dairy I property after JLE purchased the property at the trustee's sale on December 6, 2013.  JLE maintained that after that point in time, Debtors were trespassers.  JLE asserted that under Arizona law, certain types of damages were proper to assess for trespass, including damages for lost profits and disgorgement of profits resulting from the trespass.  Finally, JLE contended that any postpetition damages should be granted administrative priority.

On October 14, 2014, the bankruptcy court heard oral argument on the cross MSJs and took the matter under advisement.

On December 14, 2014, the court granted JLE's MSJ and

-12-

denied Debtors' MSJ, placing its oral findings of fact and conclusions of law on the record. The bankruptcy court observed that central to both motions was the issue of trespass and thus the undisputed facts must establish one way or another that Debtors' physical presence on JLE's property after the trustee's sale was without authorization.

The bankruptcy court applied the doctrine of issue preclusion in granting JLE's MSJ on the issue of Debtors' prepetition trespass. The court observed that the state court's findings in the FED action regarding ownership of Dairy I and Debtors' unauthorized possession of the property were entitled to preclusive effect. Therefore, the court concluded that Debtors' continued possession of the property after the trustee's sale constituted a trespass as a matter of law.

The court also independently found Debtors were trespassers under Arizona law. The court observed that the trustee's sale extinguished Debtors' right to remain on Dairy I based on Ariz. Rev. Statutes (A.R.S.) § 33-811(e), which provides that a trustee's deed conveys title clear of liens, claims, and interests junior to the deed of trust. Accordingly, Debtors' right to possess Dairy I terminated on December 6, 2013, and after that date Debtors' possession of the property was unauthorized.

The bankruptcy court made no determination regarding Debtors' trespass or liability for their postpetition occupancy of the property since JLE's POC was based on prepetition actions. The bankruptcy court also found that JLE presented no evidence of pre or postpetition damages and thus the court would

-13-

not offer an advisory ruling.

On January 20, 2015, the bankruptcy court entered an order denying Debtors' MSJ and granting JLE's MSJ in part, solely as it related to Debtors' prepetition trespass on the Dairy I property.

**8.    JLE's Administrative Claim**

On December 31, 2014, JLE filed its Administrative Claim which included a claim for Debtors' postpetition trespass. JLE then filed an MSJ addressing Debtors' postpetition trespass, seeking a determination that Debtors' trespass was conscious and that Debtors were required to disgorge their profits.  JLE also argued that any damages resulting from Debtors' wrongful postpetition conduct should be granted administrative priority under the holding in Reading Co. v. Brown, 391 U.S. 471, 483-85 (1968).

The bankruptcy court held a hearing on August 20, 2015, and granted JLE's MSJ in part as to the trespass based on the state court's ruling in the FED action and its own determination that Debtors were trespassers since they had no authorization to remain on the Dairy I property.  As to the damages, the court denied summary judgment finding factual issues on whether Debtors' trespass was intentional and, if so, the degree to which they benefitted.  The court also denied summary judgment on the issue of administrative priority, concluding that any priority issue would be determined after JLE had proved its damages.

**9.    The Trial**

The bankruptcy court held a trial on the issues of whether

Debtors' trespass was conscious and the appropriate measure of damages. After trial, JLE advised the bankruptcy court that it was seeking judgment for the following: For the trespass: (a) Loss of use of land: lost opportunities - $97,500 and lost profits - $3,503,831; (b) cost of restoration of land - $1,200,000, plus additional amounts after March 28, 2014; (c) annoyance/discomfort of owner - $70,000, plus additional amounts after March 28, 2014; (d) fair market rental value - $83,000 as of March 28, 2014; (e) punitive damages - TBD; (f) disgorgement of Debtors' profits: prepetition - $1,145,000 and postpetition - $7,632,756. For waste/conversion bailment: (a) physical damage to property - $2,500. Although included in its POC, JLE was no longer pursuing claims for (1) damages to a hay barn, (2) stall cleaning costs, or (3) potential liability to the Arizona Department of Water Resources. As to JLE's claims for lost profits, JLE advised the bankruptcy court that the claim was brought as an alternative to the disgorgement claim and agreed that it was not entitled to lost profits and disgorgement. The bankruptcy court took the matter under advisement.

On April 19, 2016, the court issued a memorandum decision finding that Debtors were conscious trespassers from at least the time of the trustee's sale on December 6, 2013. The court determined that due to Debtors' conscious trespass, they were liable to JLE for the benefits they received for wrongfully staying on the Dairy I property. In the end, the bankruptcy court found that disgorgement of Debtors' profits was appropriate and concluded that JLE's prepetition damage claim

-15-

was $558,716.24 and its postpetition administrative claim was $1,517,069.64. The court entered an order consistent with its ruling on the same day.

### 10. Debtors' Motion for Reconsideration; JLE's Motion For Clarification

On May 2, 2016, Debtors filed a motion for reconsideration and/or to alter or amend the bankruptcy court's (1) January 20, 2015 order denying Debtors' MSJ regarding Debtors' prepetition trespass; (2) September 17, 2015 minute entry ruling regarding Debtors' postpetition trespass; (3) Memorandum Decision; and (4) Order re proof of claim filed by JLE-04.

In the motion, Debtors maintained that the state court determined Debtors were tenants at sufferance. Since JLE never appealed that decision, Debtors argued that JLE was bound by that ruling under the principles of issue and claim preclusion. Debtors asserted that under these circumstances, JLE was entitled to damages only in the form of reasonable rent.

On September 30, 2016, the bankruptcy court denied the motion, finding there was no basis to reconsider or alter or amend the rulings. The bankruptcy court noted that FED proceedings were limited in scope with the only issue being the right of actual possession. The court further observed that due to the narrow scope of FED proceedings, the Arizona legislature made clear that plaintiffs could pursue claims for damages by a separate action, including claims for trespass damages. A.R.S. § 12-1183. Accordingly, the bankruptcy court concluded that the state court's statement that Debtors were tenants at sufferance did not preclude JLE from seeking a determination that they were

conscious trespassers liable for damages based on restitution.

The bankruptcy court also concluded that the state court's determination that Debtors were tenants at sufferance was not necessary or essential to its decision regarding whether Debtors' occupancy was lawful. Rather, once the state court found that completion of the trustee's sale terminated Debtors' right to possess the Property, the status attributed to Debtors' post-termination occupancy was of no import to its decision.

Finally, the bankruptcy court noted that the issue of trespass was not litigated nor was it required to be litigated in the state court FED proceeding. The court also observed that JLE obtained limited relief from stay authorizing the FED action to go forward, but JLE was prohibited from executing on the judgment if obtained. Therefore, the issues regarding damages, if any, were to be determined in the bankruptcy court. For these reasons, the court concluded that the trespass issue was not and should not have been raised in the summary FED proceeding. In the end, the court found no grounds to disturb its rulings that Debtors were trespassers in the pre and postpetition periods.

JLE also filed a motion for clarification of the bankruptcy court's calculations for the amount of its pre and postpetition claims. In a September 30, 2016 memorandum decision, the bankruptcy court granted JLE's motion in part and entered an amended order on September 30, 2016, finding that JLE had a prepetition claim for $579,072.51 and a postpetition claim entitled to administrative priority in the amount of $1,571,916.11. The bankruptcy court entered an amended order on

-17-

JLE's POC on the same day. Debtors filed a timely appeal from that order.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Did the bankruptcy court err by applying issue preclusion to the state court's findings in the FED action and granting JLE's MSJ on the issue whether Debtors were trespassers?

B. Did the bankruptcy court err by independently deciding that Debtors were trespassers in the pre and postpetition periods?

C. Did the bankruptcy court err by finding that Debtors were conscious trespassers?

D. Did the bankruptcy court err by applying an incorrect measure of damages for trespass; i.e., damages beyond the fair market rental value of Dairy I?

E. Did the bankruptcy court err by improperly calculating JLE's postpetition damages?

## IV. STANDARDS OF REVIEW

Rulings based on claim and issue preclusion are reviewed de novo as mixed questions of law and fact in which legal questions predominate. Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 823 (9th Cir. BAP 2006) (citing Robi v. Five Platters, Inc., 838 F.2d 318, 321 (9th Cir. 1988)). Once it is determined that preclusion doctrines are available to be applied, the actual

-18-

decision to apply them is left to the trial court's discretion. In re Khaligh, 338 B.R. at 823. When state preclusion law controls, such discretion is exercised in accordance with state law. Id. (citing Gayden v. Nourbakhsh (In re Nourbakhsh), 67 F.3d 798, 800-01 (9th Cir. 1995)).

We review de novo a bankruptcy court's summary judgment as well as its interpretation and application of relevant state law. Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000); Kona Enters. Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir. 2000).

We review factual findings such as the conscious nature of Debtors' trespass for clear error. Banks v. Gill Distribution Ctrs., Inc., 263 F.3d 862, 869 (9th Cir. 2001). A bankruptcy court's factual finding is not clearly erroneous unless it is illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

Whether the bankruptcy court used the correct legal standard in computing damages is reviewed de novo. Neptune Orient Lines, Ltd. v. Burlington N. and Santa Fe Railway Co., 213 F.3d 1118, 1119 (9th Cir. 2000).

The bankruptcy court's "computation of damages is a finding of fact we review for clear error." Simeonoff v. Hiner, 249 F.3d 883, 893 (9th Cir. 2001).

## V. DISCUSSION

**A. The bankruptcy court did not err by finding Debtors liable for trespass in the pre and postpetition periods.**

Debtors argue that the bankruptcy court erred by finding them guilty of trespass on several grounds. First, they contend

-19-

that the state court's finding in the FED action that Debtors were tenants at sufferance was preclusive as to their status regardless of when they vacated the Property. According to Debtors, they were liable as tenants at sufferance, if at all, for the reasonable rental value of the Property.

Next, Debtors argue that the state court never made any factual findings or legal conclusions that Debtors were trespassers. Therefore, Debtors assert that the bankruptcy court erred by applying issue preclusion as a basis for granting JLE's summary judgment on the issue of Debtors' trespass and erroneously drew no distinction between a tenant at sufferance and a trespasser.

Finally, Debtors maintain they could not be trespassers postpetition when the bankruptcy court directed them to remain on the Property. As explained below, we are not persuaded by these arguments.

### 1.    Issue Preclusion

Whether the state court's finding of facts or legal conclusions are entitled to preclusive effect is determined under Arizona law. Child v. Foxboro Ranch Estates, LLC (In re Child), 486 B.R. 168 (9th Cir. BAP 2013). Under Arizona law, issue preclusion applies when: (1) the issue or fact to be litigated was actually litigated in a previous suit; (2) a final judgment was entered; (3) the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter; (4) actually did litigate it; and (5) such issue or fact was essential to the prior judgment. Id. at 172 (citing Chaney Bldg. Co. v. City of Tucson, 716 P.2d 28, 30 (1986)).

-20-

Before applying these factors to this case, we briefly examine the nature of an FED action to place Debtors' "tenants at sufferance" argument in context. Since Debtors' leasehold interest was terminated by the trustee's sale, JLE had an immediate right to the Property. A.R.S. § 33-811(e). Under Arizona law, an FED action is one way to obtain possession of one's property. A.R.S. § 12-1173.01 (FED action proper when property has been sold at a trustee's sale). The FED proceeding is statutory and meant "to provide a summary, speedy and adequate means for obtaining possession of premises by one entitled to actual possession." Heywood v. Ziol, 372 P.2d 200, 201 (Ariz. 1962). The only issue determined in the proceeding is the right to actual possession of the property. Id. (citing A.R.S. § 12-1177(A): "On the trial of an action of forcible entry or forcible detainer, the only issue shall be the right of actual possession and the merits of title shall not be inquired into."). Given the limited scope of FED actions, "the only appropriate judgment is the dismissal of the complaint or the grant of possession to the plaintiff." United Effort Plan Trust v. Holm, 101 P.3d 641, 645 (Ariz. Ct. App. 2004). Because the state court is not authorized to decide any other issue besides the right of actual possession, the Arizona Legislature has provided in A.R.S. § 12-1183 that the FED action and judgment does not bar a separate action for trespass or trespass damages.

Against this background, the state court's finding that Debtors were tenants at sufferance cannot be given preclusive effect - their legal status as tenants at sufferance was neither litigated nor essential to the FED judgment. As noted by the

-21-

bankruptcy court, once the state court found that the completion of the trustee's sale terminated Debtors' right to possess the Dairy I property, the status attributed to Debtors' post termination occupancy was of no import to its decision.

In contrast, the state court's findings regarding JLE's right to possession of the property are entitled to preclusive effect on the issue of Debtors' trespass. Issue preclusion bars relitigation of identical issues that were resolved in a prior proceeding, even if the later suit involves a different cause of action. Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1399 (9th Cir. 1992). "At common law, any unauthorized physical presence on another's property is a 'trespass.'" State ex rel. Purcell v. Sup. Ct. In and For the Cty. of Maricopa, 535 P.2d 1299, 1301 (Ariz. 1975). Restatement (First) of Torts (1934) § 329 defines a trespasser as a "person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." See Webster v. Culbertson, 761 P.2d 1063, 1065 n.3 (Ariz. 1988) (following Restatement (First) of Torts in connection with landowner's liability towards trespassers).

The state court found that the trustee's sale terminated Debtors' right to possess the Dairy I property and thus Debtors "had no right to be there." For purposes of determining whether Debtors were trespassers under the Purcell definition or the Restatement (First) of Torts definition, the identical issue regarding Debtors' lawful or authorized possession of the property was actually litigated in the FED action. In other words, Debtors' physical presence on Dairy I was unauthorized

-22-

and they remained on the property without the consent of JLE. A final judgment was entered, Debtors had a full opportunity to litigate the matter and actually did litigate it, and the issue was essential to the prior judgment. Therefore, since all the elements for issue preclusion were met, we discern no error with the bankruptcy court's decision granting JLE's MSJ on the issue of Debtors' trespass based on issue preclusion.

Even if issue preclusion was not appropriate, the bankruptcy court independently decided on summary judgment that Debtors were trespassers as a matter of law. Under either the Purcell definition or the Restatement (First) of Torts definition of trespass, the record shows that JLE never consented to Debtors' continued possession of Dairy I. Accordingly, Debtors' possession was unauthorized and they had "no right to be there." The bankruptcy court thus properly found that Debtors were trespassers under Arizona law.

Debtors' reliance on their "tenants at sufferance" status in the FED action for their damage claim is misplaced. As the Arizona Court of Appeal explained:

> Use of the word 'tenant' in this phrase is unfortunate as a tenancy at sufferance is not a true landlord-tenant relationship, but rather an interest in property. It exists when a party who had a lawful possessory interest in property wrongfully continues in possession of the property after its interest terminated.

Grady v. Barth ex rel. Cty. Maricopa, 312 P. 117, 120 (Ariz. Ct. App. 2013). Contrary to Debtors' view, there is little, if any, distinction, between a tenant at sufferance and a trespasser under Arizona law. As tenants at sufferance, Debtors had no right to possession and thus they continued to occupy Dairy I

-23-

wrongfully. As trespassers, Debtors remained on the property without JLE's consent and therefore Debtors' possession was unauthorized. Indeed, the relationship between JLE and Debtors was that of owner and trespassers absent some agreement as to Debtors' continued occupancy. In short, whether tenants at sufferance or trespassers, Debtors were wrongdoers by their unauthorized continued possession of Dairy I.

In the end, the status of Debtors as tenants at sufferance is not legally inconsistent with being a conscious trespasser and the bankruptcy court implicitly so found. See generally Brady v. Scott, 175 So. 724, 725 (Fla. 1937) ("[A] tenant at sufferance is the most shadowy estate recognized at common law and practically the only distinction between such a tenant's holding and the possession of a trespasser is that the landowner may, by his acquiescence at any time base upon the tenancy at sufferance the relation of landlord and tenant, which he cannot establish at law against a mere trespasser, and that the tenant cannot be subjected to an action in trespass before entry or demand for possession.").

In sum, the FED action did not bar JLE's separate action for trespass or trespass damages. See A.R.S. § 12-1183. Based on the record before us, the bankruptcy court properly found Debtors were trespassers under Arizona law when they continued in possession of Dairy I after the trustee's sale.

**2.    The bankruptcy court did not immunize Debtors from liability for their postpetition trespass.**

Debtors maintain that the bankruptcy court specifically directed them to remain on Dairy I until June 1, 2014, and

-24-

therefore they cannot be deemed trespassers and liable for trespass damages. This argument is without merit. We found no place in the record where the bankruptcy court authorized Debtors' occupancy of Dairy I nor did we find any place where the court specifically directed them to remain on the property or indicated an intent to limit the damages available to JLE. Rather, the court's ruling in its April and May 2014 orders was that Debtors would leave the property by June 1, 2014. Further, as the bankruptcy court properly observed, the bankruptcy filing could not grant Debtors property rights that the state court ruled did not exist. See Dominic's Rest. of Dayton, Inc. v. Mantia, 683 F.3d 757, 760-61 (6th Cir. 2012) (a debtor's bankruptcy filing does not protect the debtor from claims relating to the tortious use of another's property.). In short, Debtors' delay in vacating Dairy I after the conclusion of the FED action had nothing to do with the bankruptcy court's rulings.

**B.    Damages**

Debtors argue that the bankruptcy court erred by finding that they were conscious trespassers and awarding damages to JLE on the basis of the disgorgement of profits. According to Debtors, the bankruptcy court's use of restitution damages is not supported by any cases or statutes. Therefore, they are liable, if at all, for the fair market rental value of the property. Finally, Debtors maintain that the bankruptcy court's calculation of postpetition profits was not supported by the evidence and constitutes clear error.

**1.  The bankruptcy court did not err in finding Debtors were conscious trespassers.**

A "conscious wrongdoer" is one who benefits by his misconduct and who acts "with knowledge of the underlying wrong to the claimant," or "despite a known risk that the conduct in question violates the rights of the claimant." Restatement (Third) of Restitution and Unjust Enrichment § 51(3) (2011). Misconduct is defined as "actionable interference by the defendant with the claimant's legally protected interests for which the defendant is liable." Id. at § 51(1).

The bankruptcy court found that Debtors' trespass was conscious from the December 6, 2013 trustee's sale until they vacated Dairy I on May 31, 2014.  We need not repeat each of the facts that support the bankruptcy court's conclusion, as the record contains ample instances showing Debtors' knowledge that their right to remain on Dairy I was coming to an end — either by termination of the March 1 Lease or by its extinguishment at the trustee's sale.  The record demonstrates that Debtors knew that they had to vacate the Dairy I property at the latest by the date of the trustee's sale.  Furthermore, Erik knew that JLE was the owner of the property and, based on the email from Mr. May and Erik's statement to Judge Haines at the June 26, 2014 hearing, Debtors knew that the trustee's sale extinguished their rights in the March 1 Lease and their right to occupy the Dairy I property.  Nonetheless, Debtors continued to operate their dairy at the property until May 31, 2014.  Given these facts, the bankruptcy court's finding that Debtors were conscious trespassers was logical, plausible, and supported by

inferences drawn from facts in the record.

**2. The bankruptcy court did not err by using a restitutionary measure of damages, including disgorgement of profits, to determine Debtors' liability.**

We found no Arizona case or statute that discusses restitution damages and disgorgement of profits in a trespass case such as this. Where the state's highest appellate court has not spoken on an issue, the federal court's role is to predict what decision the state's highest court would reach. See Evanston Ins. Co. v. OEA, Inc., 566 F.3d 915, 921 (9th Cir. 2009). A federal court uses "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance" to predict how the state's highest court would rule. Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia, 379 F.3d 557, 560 (9th Cir. 2004).

In the absence of controlling law, Arizona courts follow the Restatements. Keck v. Jackson, 593 P.2d 668, 669 (Ariz. 1979). Restatement (Third) of Restitution and Unjust Enrichment § 40 states: "A person who obtains a benefit by an act of trespass . . . is liable in restitution to the victim of the wrong." In comment b to this section, the Restatement explains that "[e]richment resulting from intentional trespass is not properly measured by ordinary rental value." Id. § 40, cmt. b (noting that when restitution takes the form of a money judgment, the measure of recovery depends on the blameworthiness of the defendant). "[A] conscious wrongdoer will be stripped of gains from unauthorized interference with another's property." Id.

-27-

There are policy reasons for mandating disgorgement of the wrongdoer's profits:

> Restitution requires full disgorgement of profit by a conscious wrongdoer, not just because of the moral judgment implicit in the rule of this section, but because any lesser liability would provide an inadequate incentive to lawful behavior. If A anticipates (accurately) that unauthorized interference with B's entitlement may yield profits exceeding any damages B could prove, A has a dangerous incentive to take without asking - since the nonconsensual transaction promises to be more profitable than the forgone negotiation with B. The objection of that part of the law of restitution summarized by the rule of § 3 is to frustrate any such calculation.
>
> . . .
>
> If a conscious wrongdoer were able to make profitable, unauthorized use of the claimant's property, then pay only the objective value of the assets taken or the harm inflicted, the anomalous result would be to legitimate a kind of private eminent domain (in favor of a wrongdoer) and to subject the claimant to a forced exchange. The law of restitution responds to this anomaly by making the wrongdoer liable to disgorge profits wrongfully obtained, whenever such profits exceed recoverable damages.

Id. § 40, cmt. c.

Restatement (Third) of Restitution and Unjust Enrichment § 51(4) states:

> The unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty. Restitution remedies that pursue this object are often called 'disgorgement' or 'accounting.'

The Arizona Supreme Court has held that the "remedy of restitution is not confined to any particular circumstance or set of facts. It is, rather, a flexible, equitable remedy available whenever the court finds that 'the defendant, upon the circumstances of the case, is obliged by the ties of natural

-28-

justice and equity' to make compensation for benefits received." Murdock-Bryant Const., Inc. v. Pearson, 703 P.2d 1197, 1202 (Ariz. 1985). Although the facts in Murdock-Bryant are distinguishable from those here, the Arizona Supreme court's view on the remedy of restitution demonstrates that it can be used in a variety of circumstances and its application is left to the court's discretion. In other words, restitutionary damages are not per se foreclosed in a trespass case such as this.

Finally, the case of Anderson v. Bureau of Indian Affairs, 764 F.2d 1344, 1348 (9th Cir. 1985), stands for the proposition that a lessor of real property is not limited to the recovery of rent and may be entitled to a portion of profits earned by a holdover tenant who knows that a lease has been terminated and wrongfully holds over. In Anderson, the Bureau of Indian Affairs (BIA) appealed from a summary judgment awarding it $35,938.00 of $1,000,000.00 in proceeds from crops planted and harvested on tribal land by former lessees after termination of their lease, and awarding the balance of the proceeds to the lessee. The district court relied upon two Arizona statutes: A.R.S. § 12-1271, which permits a landowner to bring an action to "recover rent, or a **fair and reasonable satisfaction** for the use and occupation of real property . . . when a tenant remains in possession after termination of his right of possession" and A.R.S. § 12-1257, which states that "[a] tenant in possession in good faith, under a lease . . . , is not liable beyond the rent in arrears at the time the action is brought, and that which afterward accrues during continuance of his possession." The

district court concluded that the tribe was entitled to recover rent in arrears under A.R.S. § 12-1271 and was limited to the recovery of the rent under § A.R.S. 12-1257.

The Ninth Circuit reversed. The court construed the meaning of **"fair and reasonable satisfaction"** in A.R.S. § 12-1271 and concluded that the BIA was not limited to the recovery of rent when the lessees planted their cotton crop knowing that the lease had been terminated. The court reasoned that it would be neither fair nor reasonable to limit the BIA's and tribe's recovery to an amount equivalent to the rent due because the tribe members could have chosen to farm the land themselves, and if they had, the crop proceeds would be theirs. However, the court found that the lessees should recover the costs they incurred in producing the crops as otherwise the BIA would receive a windfall.

While the Anderson court does not mention the Restatement (Third) of Restitution and Unjust Enrichment, the reasoning of the case supports the conclusion that a landlord is not limited to the recovery of rent for the wrongful use and occupation of his or her property. Instead, a court may order the disgorgement of profits as a remedy under certain circumstances.[7]

---

[7] Debtors contend the case is distinguishable because JLE could not have used the Dairy I property to run a dairy farm itself. While it is true that JLE was the entity created for holding the dairy properties, the record shows that Mr. Echeverria's and Mr. Odom's business plan was to update all three dairies on a rotating basis so that the Accomazzo/Ambien Dairy and Rio Loco dairy could operate effectively. They were
(continued...)

-30-

In sum, these authorities collectively show that under Arizona law a plaintiff in a trespass action is permitted to claim restitution as a measure of damages as an alternative to damages for payment of rent. Accordingly, we conclude that the bankruptcy court did not err by calculating JLE's damages using a restitutionary measure of damages, including the disgorgement of profits. Since none of the cases cited by Debtors are binding or compel a different result, it is not necessary for us to discuss them.

### 3. The bankruptcy court erred in calculating the postpetition profits.

Where the trespasser's conduct is conscious, his or her liability may be measured by the trespasser's benefit or profit from the trespass. Restatement of Restitution §§ 40, 51(4). In calculating Debtors' liability under this standard, the bankruptcy court first considered Debtors' use of its silage, which Erik admitted would have been valueless if Debtors were required to move from the property. The court calculated the amount of silage used by Debtors on a daily basis and multiplied that number by the number of days they used JLE's property postpetition to arrive at a total representing Debtors' benefit.

Next, the court considered the profits Debtors gained by being able to operate a larger dairy during the trespass period. In this regard, the bankruptcy court noted that to move onto the

[7](...continued) unable to implement that plan due to Debtors' trespass on Dairy I.

-31-

Van Leeuwen Property, Debtors had to sell 1405 dairy cows at a May auction. The remainder of their herd was moved to the Van Leeuwen property and used in Debtors' continued dairy operations. The court found Debtors directly benefitted to the extent they profited from being able to use the 1405 cows on the Dairy I property that they could not use on the Van Leeuwen property. The court then calculated Debtors' profit based on these additional cows. After applying credits for rent paid, the bankruptcy court found in the September 30, 2016 order that JLE had a prepetition claim for $579,072.51 and a postpetition claim entitled to administrative priority in the amount of $1,571,916.11.

Debtors contend that the bankruptcy court erred in calculating JLE's postpetition claim. According to Debtors, the bankruptcy court make a "critical mistake" of double-counting. This double-counting occurred because the court took the amount of silage used in the relevant time period and added that figure to a portion of the net income derived from its profits gained from operating a larger dairy operation on JLE's property. Debtors argue that it was error to include both items in the measure of restitution. Debtors also contend that the court's analysis of the amount of silage utilized by Debtors during their occupancy is not a proper method to calculate "profits" since it is an expense item. We agree.

The proper measure of recovery in this case must be the benefits, or net profits, received by Debtors from the wrongful use of JLE's property. Net profit is the business's gross revenues less any operating expenses. An operating expense

would include the silage that was bought by Debtors to feed their cows, including the extra cows that Debtors kept on the property by virtue of their wrongful trespass. Debtors did not generate a direct profit, or benefit, by use of the silage after their trespass. Instead, they simply avoided a loss of something that they had already paid for. Nonetheless, their purchase of the silage was a legitimate operating expense because it was fed to the cows which generated the profits that accrued to Debtors as a direct result of their wrongful trespass. Accordingly, the bankruptcy court erred by considering the silage as a separate component of damages which resulted in overstating and double counting the wrongfully obtained profits. Therefore, we vacate the bankruptcy court's postpetition damage award and remand for a calculation of damages consistent with this memorandum.

## VI.  CONCLUSION

For the reasons stated, we AFFIRM the bankruptcy court's findings regarding Debtors' conscious trespass in the pre and postpetition periods. We VACATE the bankruptcy court's postpetition damage award and REMAND for a calculation of damages consistent with this memorandum.